# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE
Plaintiff and Respondent,

v.

DANIEL CARL FREDERICKSON,
Defendant and Appellant.

S067392

Orange County Superior Court
96CF1713

February 3, 2020

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, and Groban concurred.

Justice Liu filed a concurring opinion.

PEOPLE v. FREDERICKSON

S067392

Opinion of the Court by Chin, J.

A jury convicted defendant, Daniel Carl Frederickson, of the first degree murder of Scott Wilson. (Pen. Code,[1] § 187, subd. (a).) It found true the special circumstance allegation that defendant committed the murder while engaged in the commission of the attempted robbery (§ 190.2, subd. (a)(17)(i)), and it also found true that defendant personally used a firearm while committing the crime (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)). Following a sanity trial, the jury found defendant was sane at the time of the crimes. After a penalty trial, the jury returned a verdict of death, and the trial court imposed a judgment of death. This appeal is automatic.

We strike an improperly imposed restitution fine and affirm the judgment in all other respects.

## I. FACTUAL BACKGROUND

On June 13, 1996, defendant walked into a home improvement store and shot the store manager once in the head, killing him. Defendant represented himself at trial with the assistance of advisory counsel.

---

[1] All further undesignated statutory references are to this code.

1

## A. Guilt Phase

### 1. Prosecution Case

On June 13, 1996, 30-year-old Scott Wilson was working as a customer service manager at the HomeBase home improvement store in Santa Ana. The store was crowded due to a relocation sale. Around 11:30 a.m., cashier Maricela Saucedo asked Wilson to make change for her to give to a customer. Wilson walked to the store's safe, which was located behind the customer service area. Saucedo turned back to her customer. Within seconds, she heard a gunshot. She turned and saw defendant waving his gun while running out of the store. Saucedo saw Wilson lying bleeding on the ground, holding 10 five-dollar bills in his hand.

Cashier Susan Bernal saw Wilson walking toward the customer service area and a man following him. Wilson did not argue with anyone and did not call out for help. Bernal saw the man shoot Wilson in the head at close range and then run out of the store.

Loss prevention employee Christopher Rodriguez saw defendant run out of the store carrying what appeared to be a silver revolver. Rodriguez followed defendant outside to an alleyway. The man entered the passenger side of a white van, which then drove away. Rodriguez memorized the license plate number and provided it to the police.

Santa Ana police officers arrived at HomeBase within a few minutes of the shooting. Officer Ronald Dryva was on the scene for two to three hours interviewing witnesses. During that time, defendant called and spoke to an employee. Defendant did not identify himself by name. The employee handed the phone to Dryva. Defendant, who believed he was

still speaking with the employee, told Dryva, "I've never killed or shot anyone before. This is stupid. That is what I do for a living. Do you understand?" Defendant continued, "You need to tell your employees that money is not worth getting killed over."

Dryva asked defendant why he "pull[ed] the trigger." Defendant replied, "Because I was flustrated [*sic*]. He didn't do what I told him. Do you understand?" Defendant explained that he followed Wilson to the safe. "While I pointed the gun at him and told him to put the money in the bag, he just started counting the money. I told him not to count the fucking money. I told him to put the money in the box. He just closed the safe and started walking away. The man continued — continued to say [that] he didn't believe I was serious. I got mad, flustrated [*sic*], so I shot him." Defendant told Dryva he would "probably" turn himself in that night.

The next day, June 14, 1996, police officers conducted surveillance outside defendant's residence. In the driveway, officers observed a white van matching the description Rodriguez had given. Approximately three hours after beginning their surveillance, officers observed the van, driven by defendant, pull out of the driveway. An officer ordered defendant to stop and exit the vehicle. Officers arrested him and searched his residence, a camper located on his grandparents' property. They found a .32-caliber revolver containing five live rounds and one empty round.

Santa Ana police investigators Phillip Lozano and Mark Steen interviewed defendant shortly after his arrest on June 14, 1996. Steen advised him of his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Defendant acknowledged he understood his rights and agreed to speak with

the officers. The prosecution played an audiotape recording of the interview for the jury. Defendant admitted he had been committing robberies for nearly 15 years and that he walked into the HomeBase on June 13 with "a game plan." Defendant first looked around to "get a feel for the place" and to identify the manager. After he identified Wilson as the manager, he waited until Wilson needed to retrieve change for a customer. He followed Wilson to the safe and said, "Excuse me?" When Wilson looked up, defendant said, "Can you put that money in this box?" Wilson ignored defendant and began counting five-dollar bills. Defendant showed Wilson part of his gun, and Wilson closed the safe door and stood up. Defendant said that "the next thing I knew, you know, [the gun] was at his temple." He expected Wilson to hand over the money and was surprised and "pissed off" that Wilson refused. After firing the shot, he ran out of the store and into his van.

Defendant explained that he called the HomeBase store approximately one hour later and asked to speak with a manager. Crying, he told the officers, "I just laid into him. I told him, 'You son of a bitch. That fucker didn't need to die.' . . . I just told him man. He ought to make his fucking life mission to instruct all of his employees of the proper procedures. Just giving the money up, and that fucker died protecting [the money]." He said he was "just tired of . . . being broke all the time" and "just got frustrated with life and shit, and said, well, fuck it man, if I get caught, you know, I'll go back in for about two or three years and, you know, . . . get out and try it again later."

The following day, newspaper reporter Marla Jo Fisher interviewed defendant in jail. Defendant admitted that he was attempting to rob the store and shot Wilson during the attempt.

He explained that Wilson did not hand over the money, and after Wilson shut the safe door, defendant shot him. According to Fisher, defendant thought "Wilson was brave but stupid. He admired Wilson's courage but thought [Wilson] was foolish for defying him and that he should have complied with his request for money." He blamed HomeBase management for failing to train their managers to hand over the money if they were robbed.

On July 25, 1996, defendant sent Officer Lozano a letter asking to speak with the investigators again. Lozano and Steen interviewed defendant at the jail on August 12. Defendant explained that he had "held back some info" regarding accomplices. He stated that he got the gun from his "associate" John McCanns. McCanns met defendant in January or February of 1996 and, at some point, moved into defendant's camper. McCanns and defendant discussed the robbery beforehand, and after the murder, McCanns took the spent shell casing.

Dr. Richard Fukomoto, the pathologist who performed the autopsy on Wilson's body, testified that Wilson died from a single gunshot wound to the head. He opined that the barrel of the gun was six to twelve inches from the wound when the gun discharged.

### 2. Defense Case

Defendant represented himself during the guilt phase. He called as a witness clinical psychologist Dr. Martha Rogers, who had evaluated defendant regarding his sanity at the time of the offense. Dr. Rogers met with defendant for almost 15 hours and reviewed defendant's juvenile records and prior psychological testing records. Dr. Rogers found no neurological injury or

impairment, and no loss of cognitive function. She found him to be "a pretty high functioning individual." She noted in her report that defendant "most likely has not had a memory lapse or loss of functioning such that he did not know or understand his behavior was wrong or illegal as he claims."

The defense also called psychologist Dr. Roberto Flores de Apodaca. Dr. Flores interviewed defendant for approximately four hours and reviewed several relevant records. Dr. Flores did not conduct any clinical testing, although he reviewed reports from testing previously conducted. He opined that defendant suffered from a personality disorder that expressed itself with narcissistic and antisocial features. He concluded that no psychiatric condition prevented defendant from knowing the difference between right and wrong, and that defendant was not insane.

Attorney Wayne Dapser testified that he was defendant's mentor through an organization called Volunteers in Parole. Dapser explained that he was struck by defendant's high degree of optimism, but there were also times when defendant got very depressed. Defendant often told Dapser that he turned down criminal activity, such as using stolen credit cards or getting involved in drugs. Dapser never felt that defendant was a danger to society. Dapser agreed that defendant had "fairly good cognitive abilities," including the ability to plot and strategize.

Defendant's 22-year-old cousin, Nick Peres, testified that defendant had previously asked Peres to kill him. When Peres refused, defendant asked him to find an assassin to kill him. He also asked Peres to help him get a gun. Peres testified that defendant used drugs "all the time."

Jan Moorehead testified that she became defendant's probation officer when he was 14 years old. Moorehead said that defendant was a "high control" parolee because of his high violence potential and mental instability. She tested him for drugs approximately twice a month. When defendant told Moorehead he felt depressed, she encouraged him to write down positive thoughts. Moorehead had referred defendant to the Volunteers in Parole program because she thought he was "worth taking a chance on."

## B. Sanity Phase

### 1. Defense Case

Defendant's advisory counsel conducted the sanity phase. Roger Wunderlich, a staff psychiatrist at Atascadero State Hospital, testified that he examined defendant on June 17, 1994, to determine, in connection with a different case, whether defendant was a Mentally Disordered Offender (MDO).[2] After interviewing defendant for 30 minutes, Dr. Wunderlich concluded defendant was an MDO. As a result, defendant was paroled to the hospital for treatment. Dr. Wunderlich testified that defendant wanted treatment under the MDO law because he "was afraid of what he might do if paroled" to the streets. On

---

[2] The Mentally Disordered Offenders Act (§ 2960 et seq.) "addresses the treatment and civil commitment of offenders who suffer from a 'severe mental disorder.'" (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1127.) "The term 'severe mental disorder' means an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or which grossly impairs behavior; or that demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely." (§ 2962, subd. (a)(2).)

cross-examination, Dr. Wunderlich said that the basis of his MDO determination was that defendant had "violent fantasies" that had, in fact, resulted in an assault. He further testified that defendant was a "coherent, fairly intelligent individual." Dr. Wunderlich opined that defendant was able to distinguish between right and wrong.

Psychiatrist Joseph Chong-Sang Wu testified that he performed positron emission tomography (PET) scans on defendant. Defendant's scans showed an impairment in his frontal lobe function, which has been reported in patients with attention deficit hyperactivity disorder. The scans also showed increased activity in defendant's temporal lobes, which is found in people with "aggressive, explosive, [and] violent" behavior.

Steven Clagett, a therapist and case manager for Health Care Agency of Orange County, testified that he evaluated defendant at the state hospital on May 5, 1995, about a year before the Wilson murder, and concluded that defendant was not suitable for release into the community. Clagett explained that defendant had not met the agency's release criteria, which included 12 months of nonaggressive behavior, cooperation with the treatment plan, and participation in the groups, programs, and activities that the agency recommended. During the evaluation, Clagett saw no evidence of a thought disorder, hallucinations, or suicidal or homicidal ideation. Defendant told Clagett that he had "played up" psychiatric symptoms in the past, trying to "get out of the prison system" and "into the hospital."

Defendant testified at the sanity trial. He said he was first hospitalized when he was 13 years old. He had been running away from home, sleeping on the streets, and getting into fights

at school. Defendant described "thought patterns" and "fantasies" that led him to "act out and to destroy or to hurt things." Sometime after his first hospital stay, defendant started taking medication that helped him control these thoughts. Defendant was hospitalized again two years later. At that time, he was diagnosed as having latent schizophrenia with explosive personality disorder.

Defendant spent his juvenile and adult life in and out of institutions. He underwent several mental health evaluations while incarcerated and testified that he functioned better while medicated, both in and out of prison. Defendant was in prison in 1994, and before his scheduled release, defendant indicated to prison mental health professionals that he wanted to be sent to the state hospital as an MDO because he did not receive mental health treatment on the streets. Following two evaluations and a parole hearing, he was committed to Atascadero on July 1, 1994. Defendant was released from the state hospital on August 22, 1995. He did not meet with the parolee outpatient doctor between the date of his release and the date of the instant offense, nearly 11 months later. He developed suicidal thoughts and, on June 13, 1996 (the date of the Wilson murder), acquired a gun with which to commit suicide. He drove to HomeBase later that day to buy material for a project he was working on with a friend. He carried the gun with him in case he found the opportunity to commit suicide while running errands. Defendant testified that he did not intend to rob the store.

On cross-examination, the prosecutor questioned defendant about several theft incidents: stealing cigarettes in 1977; possession of a stolen moped in 1978; stealing clothing from a department store in 1979; possession of a stolen moped

in 1980; stealing a car in 1981; and armed robbery of a market in 1982. Defendant also acknowledged that he pleaded guilty for stabbing a fellow inmate in September 1984, although he claimed he did not actually stab the individual. Regarding a conviction for assault with a deadly weapon in 1991, defendant testified that someone was attacking another person, and defendant tried to intervene. The family of the attacker paid defendant to plead guilty, and he agreed to do so because he "needed an excuse" to go back to prison. He denied that he committed the instant offense in order to go back to prison.

The prosecutor asked defendant about his testimony on October 7, 1997, when he testified as a gang expert for the defense in an unrelated trial. The prosecutor in that case had asked defendant if he considered himself to be insane, and defendant replied, "No." The prosecutor asked if he considered himself insane at the time he murdered Wilson, and defendant replied, "No, sir. I presented that as a defense, and it's up to a jury to decide whether I was insane at the time the crime occurred." Defendant also admitted testifying in the other trial that he had claimed to have violent fantasies so that he could get into Atascadero.

### 2. *Prosecution Case*

The prosecution recalled Drs. Flores and Rogers. Dr. Flores testified that he reviewed defendant's medical records and spoke with defendant, and that he did not believe defendant met the criteria for insanity under section 1026, which governs insanity pleas. Dr. Flores opined that at the time of Wilson's murder, defendant knew the difference between right and wrong, and he chose to ignore it. Dr. Flores believed defendant's

diagnosis of attention deficit hyperactivity disorder was "debatable" and irrelevant to the issue of insanity.

Dr. Rogers reviewed defendant's medical records and examined his behavior before, during, and after the Wilson murder. In her opinion, defendant was sane when he murdered Wilson.

Phillip Kelly, a staff psychiatrist at Atascadero, testified that he had daily contact with defendant between July 1994 and September 1995. Defendant told Dr. Kelly that he had "manipulated the examiners" into declaring him to be an MDO. When Dr. Kelly told defendant that because he manipulated himself into the hospital, he would "have to deal with the problem," defendant replied, "Well you are the experts, you shouldn't have let me get away with it." Dr. Kelly ultimately diagnosed defendant with antisocial personality disorder and substance abuse. He did not believe defendant belonged in the MDO program, concluding he did not have a mental illness.

The jury found that defendant was sane at the time he committed the crime.

## C. Penalty Phase

### 1. Prosecution Evidence

Four witnesses testified regarding defendant's prior criminal activity. Jeff Tawasha testified that he was working as a cashier at a market on October 25, 1981. Around 3:00 p.m., defendant, wearing a stocking over his face, entered the market with a sawed-off shotgun and said, "This is a robbery. Give me the money or I'll blow your head off." A female customer walked into the store, and defendant pointed the shotgun at her and ordered her behind the counter. He then ordered Tawasha to

take cash out of the cash register and put the money in his bag. Defendant ran out on foot and entered a waiting vehicle.

Correctional Officer Grant Henry testified that on January 12, 1983, he conducted a search of defendant's jail cell and found a "manufactured stabbing implement." The weapon had been made by sharpening a metal rod.

Correctional Lieutenant Richard Martinez testified that on March 7, 1984, he was working as a floor officer in the prison where defendant was housed. At approximately 8:00 p.m., Martinez was talking to an inmate when defendant began stabbing the inmate. Defendant stabbed the inmate three to seven times before Martinez separated them.

Deputy Sheriff Bradford Blakely testified that on November 15, 1990, he was working in a men's jail where defendant was housed. While searching defendant's cell, he found a five-inch stabbing instrument fabricated from a mop bucket.

The prosecutor also introduced defendant's testimony from an unrelated trial, in which he admitted that in 1991 he had stabbed a man six times.

Four witnesses testified regarding defendant's mental health. Dr. Flores testified that defendant's personality disorder had minimal to no impact on his free will. He explained that defendant's "history is not indicative of someone who acts in an irrational manner, out of touch with reality in ways that don't make sense. His history is consistent with someone who violates the rights of others, consistently." Dr. Hannah McGregor, a psychiatrist with the California Department of Corrections, testified that she certified defendant as an MDO in 1994 after she reviewed reports from Dr. Wunderlich and

another psychiatrist, Dr. Steven Moberg. Neurologist Dr. Helen Mayberg testified that she reviewed defendant's PET scans. She disagreed with many of Dr. Wu's findings and methods. She further opined that defendant's frontal lobes were "relatively normal" and that his temporal lobes were normal. Psychologist Dr. Leisla Howell testified that she had evaluated defendant in 1982 at a state prison following his armed robbery conviction. She testified that defendant did not take responsibility for his actions and blamed "everything on everybody for his difficulties."

The prosecution also recalled reporter Marla Jo Fisher, who testified that defendant had told her that he had committed the robbery because he wanted to go back to prison. He told Fisher that he did not like "life on the outside." He appeared apologetic for shooting Wilson, but blamed HomeBase officials for failing to teach employees to hand over money without arguing.

Officer Mark Steen testified regarding his interview of defendant, conducted with Officer Lozano, on June 14, 1996. When Steen asked defendant why he tried to commit a robbery, defendant replied that he was "tired of being broke all the time" and "want[ed] to be rich." Defendant told the investigators that he was "in [his] right mind" during the attempted robbery.

Three witnesses provided victim impact testimony. Maricela Saucedo, the cashier who asked Wilson for change, testified that Wilson had been her manager for two months, during which time she saw him nearly every day. She described Wilson as outgoing, understanding, friendly, and a hard worker. She felt responsible for his death, because if she had not asked him for change, he would not have walked to the safe and would

not have been killed. Wilson's aunt, Joyce Fyock, testified that Wilson's father had died when he was a toddler and that she had helped his mother care for him. She described Wilson as outgoing and said he cared about people. She discussed visiting Wilson in the hospital before he died and having to take Wilson's mother to the mortuary. Wilson's brother Kirk testified that because he was 10 years older than Wilson and because their father had died, the brothers had a father-son relationship. He described walking into Wilson's hospital room and staying in the room until Wilson was pronounced dead about five hours later. He testified that Wilson enjoyed working at HomeBase because he liked being around people, but he said that Wilson was also trying to pursue a career in sports broadcasting. Wilson had just become an intern at a local network and produced one sports promotional segment before he died.

### 2. Defense Evidence

The defense recalled Dr. Wu, who disagreed with Dr. Mayberg's conclusions and interpretations of defendant's PET scans.

Defendant testified on his own behalf, with advisory counsel conducting the examination. He explained that his family moved frequently and that his father left when he was five years old. He struggled to fit in with his peers and even with members of his own family, because he was a "mixture of Scandinavian and Hispanic." He attended school through seventh grade and applied for his General Educational Development (GED) certificate in 1982, at the age of 19, while incarcerated. Defendant served in the United States Navy for five months in 1982, receiving an honorable discharge. From the time he was 12 years old until trial, when he was 34 years

old, defendant estimated that he spent 15 years in group homes, juvenile halls, or state institutions.

Defendant studied religion and language while incarcerated, and he spent time with several different religious communities. In 1992, he earned vocational certificates in drywall installation and small engine repair. In 1995, he earned four computer and programming certificates. Defendant explained that he felt motivated and was able to focus on his studies because of the "external controls" that existed in prison and because of the guidance provided by deputies, counselors, and correctional officers.

Defendant further testified that he was "groomed" to join the Mexican Mafia gang beginning in 1981 and that he officially joined the gang in 1984. He withdrew from the gang in 1985 after he disagreed with the gang's decision to go to war with other prisoners. Shortly after, a fellow Mexican Mafia member stabbed defendant with a welding rod, because leaving a gang was punishable with death. Defendant's subsequent prison sentences had to be served in protective custody.

He said that he asked his mother several times to attend the penalty phase of his trial, but she did not want to testify, because her husband's parents did not know about the offense, and she worried they would find out about it if she testified on behalf of her son.

Defendant asked the jury to return a verdict of death. He explained that he had wanted to be put to death since the day of his arrest. The death penalty would be a "fitting end to a ruined life." He also said that he would "like to apologize" and that he had never denied his guilt. He said that he had tried to plead guilty and "acknowledge full responsibility to all of the charges,

including the special circumstances, even though I don't believe in my mind that they're true."

The defense recalled Volunteers in Parole mentor Wayne Dapser. Dapser testified that he knew defendant "probably better than anyone in this courtroom." He believed defendant was one of the most intelligent men he knew. He stated that defendant "had a childhood from hell" and "a history that very few of us can even comprehend." Dapser did not believe defendant deserved the death penalty.

## II. GUILT PHASE ISSUES

## A. Self-Representation and Desire to Plead Guilty

Defendant raises several arguments in relation to his decision to represent himself and his desire to plead guilty in the municipal court prior to his preliminary hearing. Before addressing the specific arguments, a detailed description of the relevant procedural history is necessary.

### 1. Procedural Background

On June 18, 1996, defendant appeared for arraignment before a municipal court magistrate. (Former §§ 859, 859b, 860.) At defendant's request, the court appointed the public defender to represent him, and the arraignment was continued to a later date. On July 16, 1996, defendant filed a handwritten motion seeking to proceed in propria persona (in pro. per.). At a hearing in the municipal court on August 22, 1996, the court asked defendant, "You are willing to roll the dice all by yourself without any skills of an experienced attorney to assist you?" Defendant replied that he did not trust the public defender's office. The court warned defendant that, as a self-represented defendant, he would not have special privileges, that his "opposition will be a skilled and talented attorney," that if

convicted he could not later complain he did not have effective assistance of counsel, and that he would be unable to change his mind during the trial. Defendant's counsel then asked the court to defer ruling on the motion, and the court continued the matter to the date of the scheduled arraignment.

At the arraignment on October 30, 1996, defendant informed the municipal court that he did *not* then want to represent himself, but he reserved the right to represent himself at some later point. Additionally, defendant requested a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), asking the judge to replace one or both of his attorneys. The court conducted a *Marsden* hearing in chambers. Defendant explained that he had "zero confidence" in his two attorneys and that he did not want "that vigorous of a defense." He continued, "I want them to let me — allow me to steer them away from certain witnesses that I don't want called onto the stand because of — you know, I just — I just don't want certain information coming out." Defendant clarified that he was concerned about information coming out in the penalty phase of the case, not the guilt phase. The court explained, "Well, you're here now facing just a preliminary hearing, where the People put on some of their evidence and the defense puts on nothing. So you're talking about way down the line at trial and then sentencing rights." Defendant replied that he wanted to waive the preliminary hearing and plead guilty. He acknowledged that his attorneys were not ineffective and that he was not yet ready to represent himself, but he wanted counsel who would not work as hard. The court explained that it could not remove counsel for working too hard and denied the *Marsden* motion.

After holding the *Marsden* hearing, the municipal court arraigned defendant. Defense counsel acknowledged receipt of

a copy of the complaint, waived reading and advisement, and entered a plea of not guilty. Defendant then said, "Over my objection." Defense counsel clarified, "What he means is he would like to have the complaint read." Defendant did not offer any further clarification, and the court noted his objection on the record.

One week later, on November 7, 1996, defendant made an oral motion in the municipal court to proceed in propria persona. Defendant said that he had a GED certificate, was aware he faced the death penalty, and had previously represented himself in superior court proceedings. Defendant's only concern was whether, as a self-represented defendant, he would still have the ability to request funding for an investigator, and the court assured him he would. The court stated that it found defendant to be "a very bright person, mentally alert," and it granted the motion to proceed in propria persona. Defendant then accepted the court's offer to appoint advisory counsel, and the court appointed Edgar Freeman. The court went through defendant's list of requested jail privileges related to his status as a self-represented defendant, and it granted much of what defendant sought.

At an in camera hearing on December 5, 1996, defendant asked the municipal court to award funds for a guilt phase investigator and a penalty phase investigator. The court explained that the district attorney had not yet declared an intent to pursue the death penalty and therefore the case was not yet a capital case. Defendant responded that the prosecutor had stated in open court that it was a capital case. Defendant also informed the court that he had submitted a letter to the prosecution offering "to stipulate to the murder in the first degree and admit all special circumstances and waive all

appellate rights in order for a sentence of life without the possibility of parole." Defendant said, "The district attorney has refused that. It's a death penalty case, your honor. I wish it wasn't." The court then explained that it only needed to provide sufficient investigation funding to allow defendant to have a fair preliminary hearing; after that, assuming defendant was held to answer in the superior court, the superior court would be responsible for disbursing investigation funds. The court then appointed an investigator and explained that the investigator could submit bills to the court for the court's discretionary consideration.

On December 17, 1996, the municipal court called defendant back for another in camera hearing, revoking all prior orders concerning jail privileges and substituting a new order that, among other things, granted no more than $3,000 in investigative funds. When the court denied defendant's request for an additional $3,000 for office supplies, defendant complained that the county provided the public defender's office with money for office supplies, and he accused the court of not taking his case seriously. The court replied that "this is a very serious case. I want you to appreciate your life is on the line and that you're not, despite what you think, you are not, I don't believe, capable of adequately representing yourself, that is, doing a legally competent job. . . . I want you to know that my offer to appoint counsel for you remains outstanding." Defendant replied, "I'll accept if you are going to appoint secondary counsel on the case under [section] 987, subsection (d), which grants a second attorney to a capital defendant." The court asked whether defendant intended to continue to act as his own lead counsel, and defendant responded in the affirmative, indicating that his request was for appointment of

cocounsel in place of advisory counsel. The court denied the request without prejudice.

On December 20, 1996, the municipal court called defendant back once again, this time to make clarifications regarding its prior orders. Defendant expressed frustration with some of his self-representation jail privileges, mentioning in particular his inability to reach his investigator via collect calls. The court then acknowledged its previous denial of defendant's request for secondary counsel, and it offered defendant the opportunity to show a need for such counsel. Defendant argued that, given the limitations of his jail privileges, it would help him to have second counsel to prepare briefs and motions, and to make appearances on minor matters. He told the court that writing motions was "a little bit above" him but added, "I am stubborn enough that if the court does not grant me a second chair, I will continue to fight the case as best I can." The court granted defendant's request and appointed Edgar Freeman as "second counsel," vacating Freeman's appointment as advisory counsel. The significance of that change was apparently that Freeman could make appearances on behalf of defendant.

As of December 24, 1996, the case was being formally treated as a capital case, and a superior court judge, sitting in camera, was handling disbursements of investigative funds under section 987.9. (See *Anderson v. Justice Court* (1979) 99 Cal.App.3d 398, 402 ["[T]he superior court is the only court with jurisdiction to entertain an application for funds under section 987.9. . . . A magistrate has only such powers as are statutorily granted and it cannot be said that section 987.9 clearly grants this power to the magistrate."].) For purposes of the preliminary

hearing, however, the case was still before a municipal court magistrate. (See former § 860.)

On January 23, 1997, a superior court judge held an in camera hearing to discuss defendant's request to replace his investigator. The court stated at the outset of the hearing that it had received notice that an officer had discovered a file folder containing nude photographs in defendant's jail cell. This discovery indicated a violation of defendant's self-representation jail privileges, because the photographs were being stored in plastic sheet protectors that defendant had requested from the court for purposes of preparing his defense. When the superior court judge raised the issue, defendant stated, "Well, if the court would please hear my first motion, this matter could become moot very fast."

Defendant then informed the superior court that he wanted to "go public" — as opposed to in camera — and plead guilty. He requested the court schedule the penalty phase for February 5, 1997, and reappoint the public defender's office to represent him. He stated that he had already spoken with his previous attorneys and that they had agreed to take the case for the penalty phase after he pleaded guilty. The superior court judge asked defendant if he had spoken to cocounsel Freeman and received advice about pleading guilty. Defendant replied that he had spoken to Freeman but "this is not on the advice of anyone, sir. This is a decision that I have made based on the fact that there is absolutely zero potential for me receiving any type of justice whatsoever." He expressed frustration over his inability to get a working computer in jail and his difficulty placing unmonitored telephone calls. He continued, "I do not care to allow the State of California, the government, to run over me. I just want to go ahead, plead guilty, go and put my life in

front of a jury, and let the jury decide whether or not I should get this death penalty, or whether I should get life imprisonment. But as to the matter of death, I don't even want to play these games anymore. I want to just go ahead, I want to enter a plea of guilty. I have a right to do so, and I wish to do so at this time. [¶] I've spoken with counsel. And like I said, I would drop my pro. per. status and accept the public defender's office to represent me as far as the penalty phase is concerned. And if the court would take my waiver, I'm making a knowing and . . . intelligent waiver."

As noted, this request to plead guilty arose while the superior court was holding an in camera hearing solely to address the disbursement of investigative funds under section 987.9. The case was not otherwise in the superior court, since the preliminary hearing had not occurred and defendant had not been held to answer. The superior court therefore explained to defendant that "the issue as to whether or not you're going to plead guilty or waive a preliminary hearing is really not before me today." Defendant replied, "I would like it to be before you because it would handle a lot of these other matters."

Defendant explained that he had received money from the court for investigation services but had not received an investigative report, and he had to "keep coming to this court and begging for phone calls, begging for materials, begging for this, while a criminal investigation needs to proceed." The court then stated that it would hold a hearing the following week on the allegations surrounding defendant's jail violation, and it temporarily suspended his self-representation jail privileges. The court continued, "But I would be frank with you and say this is one of the things I tried to talk to you [about] out front when I kind of bottom-lined it [on] one of the first days you were in

court.  I sincerely hope you're sincere in wanting these privileges to defend yourself."  Defendant replied that he did not believe the court had ever been sincere in its efforts to assist him.  He added that he would "still like to make the matter moot" by waiving the preliminary hearing, pleading guilty, and accepting the appointment of the public defender's office for the penalty phase.

The court then agreed to help defendant.  It said, "With your permission and request, I'll contact — or have my clerk contact — the judicial officer in Division [311 (where the preliminary hearing was scheduled to be held)] and request your matter be calendared as soon as possible because you want [¶] . . . [¶] . . . to consider a change of plea or waiver of preliminary hearing . . . ."  Later, defendant said, "I'm pleading guilty and that's that."  The court responded, "Well, you haven't done that yet," and defendant said, "Well, I'm attempting to very, very, very hard."  When asked whether he had discussed the matter with cocounsel Freeman, defendant answered that he had done so.  Defendant discussed the difficulties he was having with his investigator, and he repeated that the problem would be moot if the court would allow him to plead guilty.  The court then told defendant, "That part of the matter's not before me. [¶] . . . [¶]  Okay.  Those matters are pending in [Division] 311 [of the municipal court] [¶] . . . [¶]  We're going to make arrangements to have you brought over to [Division] 311, and you can discuss your desires there."

After more discussion concerning defendant's request to replace his investigator, the court denied that request.  The court then made clear that it intended to assist defendant in his effort to waive the preliminary examination and plead guilty.  The court said, "[We]'ll do our best to get you calendared in

[Division] 311 [of the municipal court] as soon as possible. I can't guarantee when that will be. As soon as we're in recess, I'm sure my clerk will call over there. If I have to call over there personally, I would do it." The hearing then came to an end. The minute order for the hearing reflected the court's effort to help defendant achieve his aim of pleading guilty. It states: "Defendant's oral request that preliminary hearing in Div. 311 be advanced and waived, that defendant be allowed to change his plea to a guilty plea and that the Public Defender be appointed to represent defendant. Court orders that Div. 311 be contacted by the Court clerk and that defendant's requests be expedited in Div. 311."

A few days later, on January 27, 1997, the superior court held another in camera hearing, this time to address defendant's violation of his self-representation jail privileges. The court stated, "It appears to me in this short time that I have been involved in this case that Mr. Frederickson at least has a dual focus in what he is doing. Part of it he is trying to defend himself, and part of it he is trying to use his pro. per. privileges to do other things that common sense would indicate just aren't appropriate and are a violation of the implicit terms of the pro. per. privilege. [¶] . . . He was in court the other day on the 23rd. He indicated that, well, judge, you don't have to worry about it. I am going to waive the preliminary hearing. I am going to plead guilty. . . . [¶] He wanted me to contact the judge at [Division] 311 to see if he could be brought over there to waive [the] preliminary hearing or whatever he was talking about doing."

Cocounsel Freeman then represented to the court that defendant was dedicated and committed but had, in his opinion, a low tolerance for frustration. Freeman stated that after a "series of frustrations," including a poorly functioning computer,

defendant told him that he wanted to " 'go in and plead guilty in muni[cipal] court and get this over with and get it on the road and let the public defender handle [the] penalty phase.' " Freeman continued, "I told him, 'Well, Daniel, that is your decision. That is up to you. I will not participate in entering into a plea with you in your case.' I have told him that."

Lieutenant Danny Jarvis, a facility master at the intake center that housed defendant, then testified about defendant's violation of his self-representation jail privileges. Jarvis explained that defendant was "very, very inconvenient to care for," because he was in protective custody due to his self-representation. He continued, "What I see that he is doing within the jail environment, he is using his pro. per. status to manipulate his status within the areas that he is housed to try to bring more credence on him so he can have some sort of status and role within the jail population, which makes it doubly difficult." After more discussion among the court, defendant, and cocounsel Freeman, the court revoked defendant's self-representation jail privileges. It closed the hearing by again offering to help defendant to waive his preliminary hearing and plead guilty, if that was what defendant still wanted: "We will call [the municipal court judge assigned to your case] and see if she can work it in sometime late this morning, or sometime this afternoon."

That afternoon, defendant appeared in the department of the municipal court assigned to his case. He explained to the court, "[T]he guilt of my crime has been weighing heavily on me with a remorseful heart. I would like to offer a change of plea and enter a plea of guilty to murder in the first degree and admit the special circumstances and waive all appellate rights at this time." The prosecutor then requested to speak with both

defendant and Freeman off the record. Following that conversation, the prosecutor informed the municipal court that he had explained to defendant that "by law he cannot plead guilty to a special circumstances allegation case." The prosecutor continued, "I told him no judge can accept your plea. [¶] Furthermore, I told him that it was my opinion Mr. Freeman would offer him the best possible representation and suggested that he follow Mr. Freeman's advice on the matter. [¶] It's my understanding Mr. Frederickson — despite Mr. Freeman's conversations with him and my own conversations with him in Mr. Freeman's presence — Mr. Frederickson still wants to plead guilty, although I think he realizes that he cannot." The prosecutor added, "I think it's his desire to actually waive the preliminary hearing which is still scheduled for February 5th. My last suggestion to him was not to do anything today. That we just come on February 5th and have more of a chance to think about it. To talk to Mr. Freeman, or talk to his investigator, and then he can decide what he wants to do on the 5th."

The court reminded the parties that the People also have a right to a preliminary hearing, and even if defendant waived his right, the People could choose not to do so. The prosecutor stated that the People were not prepared to waive the preliminary hearing at that time, although the People might be willing to do so on the scheduled date of the hearing. The court then explained to defendant, "If the People are unwilling at this time, or at any time, to waive the preliminary hearing, it doesn't really matter [that you want to do so], because they have the right to have a preliminary hearing in your case. . . . [¶] So [the prosecutor] is telling me that he is not prepared today to make that decision even if you are. So to have further discussions and

undertake further proceedings today would be — for lack of a better word — a waste of time, and I am going to suggest that we terminate these proceedings today and that you come back on February 5th. [¶] . . . You will have had another nine days to think about this and decide whether or not you truly want to waive [the] preliminary hearing or not."[3]  Defendant agreed with that solution.

On the scheduled date of the preliminary hearing, February 5, 1997, defendant never requested to waive the hearing, and the hearing proceeded.  At the end of the hearing, defendant was held to answer the allegations of the complaint in the superior court.

By information filed in the superior court on February 18, 1997, the People formally charged defendant with one count of first degree murder, an enhancement allegation of personal use of a firearm, and a robbery-murder special circumstance allegation.  On February 24, 1997, defendant appeared in superior court with cocounsel Freeman and entered pleas of not

---

[3]  The magistrate's statement implied that defendant could waive the preliminary hearing despite his self-represented status.  The text of former section 860 and relevant case law suggest otherwise.  (See former § 860, Stats. 1963, ch. 1174, § 2, p. 2670 [". . . a defendant *represented by counsel* may . . . waive his right to an examination . . . ," italics added]; *People v. White* (1963) 213 Cal.App.2d 171, 174 ["Unless represented by counsel a felony defendant who appears before a committing magistrate may not . . . waive a preliminary examination (Pen. Code, § 860)."].)  Defendant did, however, have the assistance of Edgar Freeman who, per the magistrate's order, was serving as "second counsel."  We need not decide whether, with Freeman serving in that role, defendant could waive the preliminary hearing, because, as noted in the main text, the People were not prepared to join such a waiver.

guilty and not guilty by reason of insanity. Defendant said nothing about a desire to plead guilty. At an appearance the following day, defendant confirmed that despite the revocation of his self-representation jail privileges, he still intended to represent himself. Then, during an in camera hearing on February 28, 1997, the court granted defendant's request to appoint a second investigator, tasked solely with interviewing his family. The court also reinstated defendant's jail privileges.

On March 14, 1997, the assigned trial judge began presiding over defendant's case. On the same date, the prosecutor requested the court take a second waiver of defendant's right to counsel (see *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*)), because the first waiver occurred before the People had formally declared an intent to seek the death penalty. Defendant stated he understood his rights and the maximum sentence he faced, and he signed a written *Faretta* waiver.

At a pretrial hearing on July 25, 1997, defendant told the court, "I'm contemplating withdrawing my right to . . . plead in propria persona and ask for counsel to start representing me." Later in the hearing, defendant explained, "[O]ne of the reasons why I would even be considering giving up my pro. per. status would be [that] I feel, if counsel represents me, the court will give counsel the funds to do it, whereas they won't give it to me." The judge presiding over the trial of a capital case does not oversee disbursement of investigative funds (§ 987.9, subd. (a)), and therefore the court responded, "It's an issue I'm not involved in, so I really can't comment."

On August 1, 1997, the trial court held a *Marsden* hearing at defendant's request, despite the circumstance that defendant

was representing himself.  Defendant explained, "I wanted to let the court know, if the court was not aware, that I'm in pro. per. I'm lead counsel; he is second chair. . . .  This hearing was not about [cocounsel] Freeman or whether or not he was effectively representing me.  It's about whether I'm effectively representing myself as a pro. per. defendant.  It sounds funny, a pro. per. defendant stating that he's complaining of ineffective representation, but through all the information that I've been filing, the court has doggedly refused to give me funds for my investigation. . . .  And if that continues, your honor, then obviously I'm going to lose.  And I feel if I continue to represent myself, it would be a danger to my life, and therefore, if the court steadfastly refuse[s] to acknowledge that the defendant needs [section] 987.9 funds for an investigation, then the defendant would request that the court appoint counsel, [so] that the court will give money to defend me, which is wrong.  I shouldn't have to waive my right for defending myself just so I can have money to effectively represent myself, that's what I'm complaining of."

The court reminded defendant that by representing himself, he could not claim incompetence of counsel.  Defendant replied, "I'm complaining actually of incompetence of judiciary in this case."  The court then informed defendant that an appointed attorney would not be given unlimited investigative funds, and it asked, "So I just need to know if you want to represent yourself, or do you want [the] court to appoint counsel for you?"  Defendant said that he was withdrawing his *Marsden* motion and would continue to represent himself.

The same issue came up again on September 25, 1997.  During an in camera hearing, the court read aloud a note it had received from defendant:  " 'Sir, I am requesting an ex parte, in camera hearing with you to discuss the very possible mechanics

29

of turning my case over to appointed counsel. My reasons are legion, but the biggest is the fact that the court will not give me investigative funds to fully investigate my cause. I know that it is only due to my persistence of wanting pro. per. that this is the case. [¶] So the issues to be discussed by us in camera and ex parte are: 1. Appointment of new lead counsel; 2. Appointment of new second chair; 3. Hear any argument by defendant and counsel for the purpose of retaining some of the pro. per. privileges now enjoyed to assist in the speedy transition of case information.' " The note continued: " 'Sir, I know that a lot of men go pro. per. just to confound the court's process. I assure you my intention was honorable. It is still my desire to defend myself, but I cannot present a case to [the] jury without a full and proper investigation. The court will be open to new counsel's requests, where they were closed to mine. I know that this will also probably make me waive more time, a thing the court knows I do not want to do, but if we could just sit down and work out a good plan of action immediately, I am sure the end of justice will be served. Thank you, sir.' "

After a lengthy discussion, the court explained: "I've always been prepared to work with you, sir, the problem, sir, I can't hold you to a lower standard than I hold everybody else. Someone who represents himself or herself basically steps into the shoes of someone that is represented by counsel, and so there aren't any special privileges. Your pro. per. privileges I don't think are special privileges; we basically afford you . . . the privileges so you can basically be able to do the same things that a lawyer can do if the lawyer were representing you." Defendant then asked to speak with cocounsel Freeman off the record. On return, the court asked defendant to state his "desire with respect to representation." Defendant asked to discuss funding

first, "because that's the primary motivation of whether or not I will continue in pro. per. or give the case over to counsel, but I mean it seems dangerous . . . for me to set precedent for the rest of the pro. per. [litigant]s if all the court has to do is set a few harsh standards, and then the pro. per. [litigant] can lay down, and counsel can step in and automatically start getting funds available to do the case. It would be dangerous to future pro. per. [litigant]s of the United States of America." The court then reminded defendant that there was no guarantee that an attorney would receive investigative funds that defendant had not received, and the court asked defendant if he wished to continue to represent himself. Defendant said, "I intend to proceed in pro. per."

On October 20, 1997, during a pretrial conference, the court initiated a discussion on cocounsel Freeman's role during trial. The court opined that "advisory counsel is just that, an advisory counsel. There is no such thing as a pro. per. cocounsel." Defendant explained that Freeman had been relieved as advisory counsel and appointed as cocounsel under section 987, subdivision (d). Defendant further related that he planned to present the opening statement and closing argument, and to conduct the examination of witnesses during the guilt phase, while Freeman would conduct the sanity phase. Defendant and Freeman planned to share responsibilities during the penalty phase, with defendant conducting the opening statement and the examination of witnesses, Freeman conducting the direct and redirect examination of defendant, and both of them conducting the closing argument.

The court responded, "I'm somewhat puzzled at [the municipal court's] order, because the research that I've done indicates that there is no such thing as cocounsel when the

defendant is pro. per." The court continued, "The reason I need to sort that out is because in my opinion, if you are going to be representing yourself, you need to represent yourself in all processes — all stages of the trial." After defendant requested that Freeman be permitted to object on his behalf throughout trial, the court said, "No. You either represent yourself or you don't. He can certainly advise you. . . . But in terms of him acting as your attorney, either he is your attorney or he's advisory counsel, which means it's up to you." After more discussion, the court concluded that the previous appointment of Freeman as second chair was inappropriate. It said: "So I'm going to be conducting this trial as if you are representing yourself in pro. per., and Mr. Freeman is your advisory counsel."

Shortly thereafter, the prosecutor asked the court to order defendant not to mention any discussion of a proposed plea deal in front of the jury. Defendant replied by bringing up his earlier attempt to plead guilty: "In Division 311 and on several occasions the defendant has attempted to plead guilty, and the prosecution has refused to accept that. Counsel at that time refused to join, and the court refused to accept that or acknowledge my plea of guilty, but it was placed on the record." The prosecutor acknowledged that "[i]t was placed on the record" but pointed out that "the Penal Code specifically disallows a guilty plea while he's in pro. per., and no counsel has ever agreed to join in his plea, so technically it's an illegal, unacceptable plea and still should not be mentioned to this jury." The court agreed that defendant's attempts to plead guilty were not relevant for the guilt phase, but the question was "open to argument" for the sanity and penalty phases.

On October 27, 1997, defendant again asked the court to allow him to introduce evidence of his attempts to plead guilty.

He said, "Your honor, a clear and distinct part of my testimony and evidence is the fact of my remorse and confession. It would appear to a trier of fact that I am playing a game by pleading not guilty yet introducing evidence of my confessions of guilt. Just because my attorneys have refused to join my plea pursuant to [section] 1018 does not alter the truth. The truth is that I have attempted to plead guilty and accept responsibility for the [violation of section] 187. [¶] . . . [¶] . . . The jury is going to feel like, well, if he's confessing and now coming in front of us and saying he's not guilty, he's pulling the wool over our eyes. My veracity is at stake here, your honor." Defendant then asked the court to introduce evidence that defendant had "accepted responsibility and guilt for [his] crime and [had] attempted to plead guilty." The court reminded defendant that such information was relevant at the penalty phase but not at the guilt phase. Defendant nonetheless asked the court to "instruct the jury on [section] 1018." He asked that the court explain to the jury "that the defendant has attempted to plead guilty" but that, by law, he could not do so. The court again ruled that the information was relevant only at the penalty phase, not at the guilt phase.

## 2. Right to Plead Guilty

Defendant contends that he was denied his personal and fundamental right to control his defense when the trial court, acting under compulsion of section 1018, refused to permit him to plead guilty without the consent of counsel. We conclude his claim is forfeited because he never moved to plead guilty in the superior court, thereby causing that court to invoke section 1018.

### a. *Legal Background*

Section 1018 provides in relevant part: "No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel." This portion of section 1018 was added in 1973 as part of an extensive revision to the death penalty laws. (Stats.1973, ch. 719, § 11, p. 1301.) "The fact that the requirement of counsel's consent to guilty pleas in capital cases was enacted as part of [an extensive revision of the state's death penalty laws in response to *Furman v. Georgia* (1972) 408 U.S. 238] demonstrates that the Legislature intended it to serve as a further independent safeguard against erroneous imposition of a death sentence." (*People v. Chadd* (1981) 28 Cal.3d 739, 750 (*Chadd*).)

Two years after the 1973 amendment to section 1018, the high court recognized a defendant's constitutional right to self-representation in *Faretta, supra*, 422 U.S. 806. In *Chadd, supra*, 28 Cal.3d 739, we reconciled the right of self-representation with section 1018's requirement that counsel consent to a guilty plea in a capital offense. Defense counsel in *Chadd* informed the trial court that the defendant wanted to plead guilty against counsel's advice, and counsel explained that he would not consent to his client entering such a plea, because the defendant's desire was to commit suicide. (*Id*. at p. 744.) The defendant admitted to the court that he had attempted suicide, and if he did not receive the death penalty, he would "just have to do it myself." (*Id*. at p. 745.) Defense counsel reminded the court that a guilty plea by his client was without his consent, and the prosecutor agreed that section 1018

prohibited the court from accepting such a plea. (*Chadd*, at p. 745.)

The trial court ruled that if it found the defendant competent to act as his own attorney under *Faretta*, it could accept his guilty plea despite section 1018. (*Chadd*, *supra*, 28 Cal.3d at p. 745.) The court questioned the defendant, found him competent under *Faretta*, and then, without actually dismissing defense counsel, allowed the defendant to plead guilty to the information. (*Chadd*, at p. 745.) On appeal, the Attorney General argued that section 1018 could be construed to permit a capital defendant to discharge his attorney, represent himself, and plead guilty. (*Chadd*, at p. 746.) We rejected this contention, however, stating that the language of section 1018 plainly required the consent of counsel to plead guilty. (*Chadd*, at p. 746.) Construing the statute "to permit a capital defendant to discharge his attorney and plead guilty if he knowingly, voluntarily, and openly waives his right to counsel" "would make a major portion of the statute redundant," we reasoned, because "that is precisely what the third sentence of section 1018 expressly authorizes *noncapital* defendants to do." (*Chadd*, at p. 747.)

We noted the larger public interest at stake in guilty pleas in capital offenses, as well as the Legislature's "increasing concern to insure that no defendant enter a guilty plea in our courts without fully understanding the nature and consequences of his act." (*Chadd*, *supra*, 28 Cal.3d at pp. 748–749.)

We read *Faretta* as not affecting the Legislature's authority to condition guilty pleas on counsel's consent. (*Chadd*, *supra*, 28 Cal.3d at p. 750.) "Nothing in *Faretta*, either

expressly or impliedly, deprives the state of the right to conclude that the danger of erroneously imposing a death sentence outweighs the minor infringement of the right of self-representation resulting when defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent." (*Chadd*, at p. 751.) We further concluded that *Faretta* did not grant a capital defendant the right to discharge counsel and waive his automatic appeal, explaining that the state, too, had an indisputable interest in correct judgments in capital cases. (*Chadd*, at p. 752.)

We again held section 1018 to be constitutional more than 25 years later in *People v. Alfaro* (2007) 41 Cal.4th 1277 (*Alfaro*). In *Alfaro*, the defendant accepted complete responsibility for the offenses in a videotaped confession on the day of her arrest. (*Id.* at p. 1295.) Eleven days before jury selection began, defense counsel informed the trial court that the defendant wanted to plead guilty to the special circumstances against counsel's advice and asked the court whether it believed he should withdraw from the case. (*Ibid.*) The defendant explained to the court that she wanted to plead guilty because she feared for her safety and that of her family should she implicate her accomplice in the crime. (*Id.* at p. 1296.) The court responded that under section 1018 she could not plead guilty against her attorney's advice. The court also declined to remove defense counsel from the case, concluding that the disagreement between counsel and the defendant involved trial tactics and therefore did not require counsel's removal. (*Alfaro*, at p. 1296.) The prosecutor then argued during the penalty phase that the defendant had not accepted responsibility and lacked remorse, and the jury did not hear evidence that the defendant had attempted to enter a guilty plea. (*Id.* at pp. 1296–1297.)

We acknowledged the defendant's argument that "a defendant has the ultimate, fundamental right to control his or her own defense," but concluded that section 1018 was "one of several exceptions to the general rule." (*Alfaro*, *supra*, 41 Cal.4th at p. 1298.) We noted that "[t]he statute constitutes a legislative recognition of the severe consequences of a guilty plea in a capital case, and provides protection against an ill-advised guilty plea and the erroneous imposition of a death sentence." (*Id*. at p. 1300.) We rejected the defendant's assertion that the trial court improperly failed to inquire into her reasons for desiring to plead guilty and that had it done so, it would have discovered her intent to demonstrate remorse. We noted that nothing in the record supported the defendant's assertion on appeal that her desire to plead guilty was motivated by a desire to establish a defense of remorse or to establish that she accepted responsibility for the murder. (*Id*. at p. 1302.) "Accordingly, the trial court reasonably concluded that the dispute between defendant and her counsel did not implicate a constitutionally protected fundamental interest that might override the plain terms of section 1018." (*Alfaro*, at p. 1302.) We left undecided whether a defendant might be able to make a successful as-applied challenge to the constitutionality of section 1018 in a case in which the evidence of guilt was very strong and the defendant's express reason for wanting to plead guilty was to lay the foundation for a remorse argument at the penalty phase.

Most recently, in *McCoy v. Louisiana* (2018) __ U.S. __ [138 S.Ct. 1500] (*McCoy*), the United States Supreme Court held that "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: *to admit guilt in the hope of gaining mercy at the sentencing stage* [of a capital case], or to maintain

his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id.* at p. __ [138 S.Ct. at p. 1505], italics added.) In *McCoy*, the defendant's retained counsel determined that the best strategy for avoiding a death sentence was to concede guilt as to the three murders during the guilt phase and plead for mercy during the penalty phase. (*Id.* at p. __ [138 S.Ct. at p. 1506].) The defendant was " 'furious' " with counsel's strategy and wanted to pursue acquittal instead. (*Ibid.*) The trial court denied the defendant's request to remove his counsel, as well as defense counsel's request to be relieved if the defendant secured other counsel. (*Ibid.*) The court told counsel that it was his decision whether to concede guilt or put on a defense case. (*Ibid.*) Defense counsel then acknowledged during his opening statement to the jury that the evidence unambiguously showed that the defendant had committed the murders. Nonetheless, the defendant testified he was innocent. (*Id.* at p. __ [138 S.Ct. at p. 1507].) The jury found the defendant guilty and then returned three death verdicts. (*Ibid.*)

The defendant, represented by new counsel, unsuccessfully moved for a new trial on the ground that the court had violated his constitutional rights by allowing counsel to concede his guilt over his objection. (*McCoy*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 1507].) The Louisiana Supreme Court affirmed the trial court's ruling, concluding that the concession was permissible because defense counsel reasonably believed that admitting guilt offered the defendant the best chance to avoid a death sentence. (*Id.* at p. __ [138 S.Ct. at p. 1507].)

The United States Supreme Court reversed the judgment. (*McCoy*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 1512].) It explained that the Sixth Amendment guarantees a defendant the right to make a defense; it " 'speaks of the "assistance" of

counsel, and an assistant, however expert, is still an assistant.' "
(*Id*. at p. __ [138 S.Ct. at p. 1508].)  While some decisions, such
as trial management, are best left to counsel, "[s]ome
decisions . . . are reserved for the client — notably, *whether to
plead guilty*, waive the right to a jury trial, testify in one's own
behalf, and forgo an appeal." (*Id*. at p. __ [138 S.Ct. at p. 1508],
italics added.)   The high court held that a defendant who
"insist[s] on maintaining her innocence at the guilt phase of a
capital trial" cannot be forced by counsel to concede guilt.
Defense counsel can make strategic choices regarding how best
to achieve a defendant's objectives, but the defendant chooses
those objectives.  (*Ibid*.)

### b.  Analysis

If defendant wanted to challenge the constitutionality of
section 1018, whether on the ground that it precluded him from
using a guilty plea to lay the foundation for a penalty phase
remorse argument or on some other ground, he needed to
request to plead guilty in the superior court and ask that court
to make a ruling based on section 1018, thus preserving the
issue on appeal.  He never did so.  The claim is therefore
forfeited.

Before 1992, there were clear jurisdictional lines
separating misdemeanor cases from felony cases:  The
municipal court had no jurisdiction in felony cases, and the
superior court had no jurisdiction in misdemeanor cases.
Therefore, in a felony case, the municipal court could not convict
a defendant on a plea of guilty, because it was not authorized to

render a felony judgment. (See, e.g., former § 1462,[4] Stats. 1976, ch. 1288, § 21, p. 5765; *People v. Callahan* (1997) 54 Cal.App.4th 1419, 1424–1425 [magistrate had no authority under the pre-1992 amendment to section 1462 to impose judgment in noncapital felony cases]; *People v. Miskiewicz* (1984) 158 Cal.App.3d 820, 824–825; *People v. Denton* (1978) 84 Cal.App.3d Supp. 1, Supp. 4–Supp. 6.) A municipal court judge, sitting as a magistrate (not as a judge), could arraign a defendant in a noncapital felony case, and if the defendant pleaded guilty (or nolo contendere), the magistrate could accept the plea and certify the case to the superior court for entry of judgment. (Former § 859a,[5] Stats. 1980, ch. 540, § 1, pp. 1495–1496; *People*

---

[4] Before 1992, former section 1462 provided: "Each municipal and justice court shall have jurisdiction in all criminal cases amounting to misdemeanor, where the offense charged was committed within the county in which such municipal or justice court is established except those of which the juvenile court is given jurisdiction and those of which other courts are given exclusive jurisdiction. Each municipal and justice court shall have exclusive jurisdiction in all cases involving the violation of ordinances of cities or towns situated within the district in which such court is established."

[5] Before 1992, former section 859a provided in relevant part: "(a) *If the public offense charged is a felony not punishable with death*, the magistrate shall immediately upon the appearance of counsel for the defendant read the complaint to the defendant and ask him whether he pleads guilty or not guilty to the offense charged therein . . . ; thereupon, or at any time thereafter, while the charge remains pending before the magistrate and when his counsel is present, the defendant may plead guilty to the offense charged . . . . [¶] (b) . . . [T]he magistrate shall, upon the receipt of a plea of guilty . . . , immediately appoint a time for pronouncing judgment in the superior court . . . ." (Italics added.)

*v. Miskiewicz*, at pp. 824–825 [upon entry of felony plea, magistrate must immediately certify case to superior court].) And, conversely, if the defendant pleaded not guilty, a municipal court judge, again sitting as a magistrate, could preside at the preliminary hearing and hold the defendant to answer. (Former § 859b, Stats. 1989, ch. 897, § 26.5, p. 3066–3067; former § 860, Stats. 1963, ch. 1174, § 2, p. 2670.) But, as stated, the municipal court lacked jurisdiction to render a felony judgment. Moreover, under former section 859a, its judges, sitting as magistrates, also lacked authority to accept a guilty plea to a felony punishable by death.

These jurisdictional lines began to blur in 1992. Former section 1462 was amended, effective that year, to allow the municipal courts to accept guilty pleas in "noncapital" felony cases and to pronounce judgment in such cases, thus reducing the burden on the superior courts. (Former § 1462,[6] Stats. 1991,

---

[6] As a result of this change, former section 1462 provided: "(a) Each municipal and justice court shall have jurisdiction in all criminal cases amounting to misdemeanor, where the offense charged was committed within the county in which the municipal or justice court is established except those of which the juvenile court is given jurisdiction and those of which other courts are given exclusive jurisdiction. Each municipal and justice court shall have exclusive jurisdiction in all cases involving the violation of ordinances of cities or towns situated within the district in which the court is established. [¶] (b) Each municipal and justice court shall have jurisdiction in all *noncapital* criminal cases to receive a plea of guilty or nolo contendere, appoint a time for pronouncing judgment under Section 859a, pronounce judgment, and refer the case to the probation officer if eligible for probation. [¶] (c) The superior courts shall have jurisdiction in all misdemeanor criminal cases to receive a plea of guilty or nolo contendere,

ch. 613, § 8, p. 2886; see former § 859a,[7] Stats. 1991, ch. 613, § 6, pp. 2884–2885.)  The same amendment allowed superior courts to take guilty pleas in misdemeanor cases, thus giving superior courts flexibility to accept misdemeanor plea bargains as a way of resolving felony charges.  (Stats. 1991, ch. 613, § 8, p. 2886.)  But the law remained unchanged for capital cases — that is, the law continued to be that the municipal court lacked jurisdiction to pronounce judgment in such cases, and its judges, sitting as magistrates, lacked statutory authority to accept guilty pleas in such cases.  Former section 1462 was again amended in 1998 in ways that are not relevant here.  (Stats. 1998, ch. 931, § 417, p. 6633.)  Finally, in 2002, due to unification of the municipal and superior courts, former section 1462 was repealed.  (Stats. 2002, ch. 784, § 554.1.)

Therefore, when defendant was in the municipal court in 1996, the judicial officers before whom he appeared were not acting as judges; rather, they were sitting as magistrates.  (See former §§ 859, 859b, 860.)  Moreover, because the offense

---

appoint a time for pronouncing judgment, and pronounce judgment.”  (Italics added.)

[7]     As a result of this change, former section 859a provided in relevant part:  “(a) *If the public offense charged is a felony not punishable with death*, the magistrate shall immediately upon the appearance of counsel for the defendant read the complaint to the defendant and ask him or her whether he or she pleads guilty or not guilty to the offense charged therein . . . .  While the charge remains pending before the magistrate and when the defendant’s counsel is present, the defendant may plead guilty to the offense charged . . . .  [¶]  (b) . . . [T]he magistrate shall, upon the receipt of a plea of guilty . . . , immediately appoint a time for *pronouncing judgment in the* superior court, *municipal court*, or justice court . . . .”  (Italics added.)

charged was a felony "punishable with death" (former § 859a, subd. (a), Stats. 1992, ch. 78, § 1, pp. 274–275), the municipal court judge (sitting as a magistrate) was, at most, empowered to deliver to defendant a copy of the complaint (former § 859, amended by initiative, Primary Elec. (June 5, 1990), commonly known as Prop. 115), inform defendant that, if needed, counsel would be provided for him at the public's expense (*ibid*.), set a time for the preliminary hearing (former § 859b, Stats. 1989, ch. 897, § 26.5, pp. 3066–3067), and, at that appointed time, "proceed to examine the case," unless such examination was waived (former § 860, Stats. 1963, ch. 1174, § 2, p. 2670). The magistrate was simply not authorized to accept a plea of guilty and pronounce judgment, because former section 859a — which authorized that procedure — only applied "[i]f the public offense charged is a felony not punishable with death." (Former § 859a.)[8]

Hence, if defendant wanted to plead guilty before his preliminary hearing, when his case was before a magistrate, his only option was (1) to waive the preliminary hearing, and then (2) enter his guilty plea in superior court to the information filed in that court. (Former § 860, Stats. 1963, ch. 1174, § 2, p. 2670.) Defendant was required to follow that two-step process. (See, e.g., *In re Van Brunt* (1966) 242 Cal.App.2d 96, 101–102.) Moreover, the People could insist on a preliminary hearing

---

[8] In a letter brief filed after oral argument, defendant concedes this point, saying, "As it appears that the municipal court could not accept his guilty plea under former section 1462, the municipal court should have certified or transferred the case to the superior court for acceptance of the plea."

notwithstanding defendant's willingness to waive it. (Former
§ 860, Stats. 1963, ch. 1174, § 2, p. 2670 ["nothing contained
herein shall prevent the district attorney . . . from requiring that
[a preliminary] examination be held as provided in this
chapter"].)[9]

Here, defendant's attempts to plead guilty, all of which
occurred before the preliminary hearing, were all rejected for
procedural reasons unrelated to section 1018. Defendant first
mentioned wanting to plead guilty on October 30, 1996, during
a *Marsden* hearing. He complained that his attorneys were
working too hard and that he did not want "certain information
getting out" during the penalty phase. When the court
explained that the penalty phase was a long time away,
defendant stated that he wanted to waive the preliminary
hearing and plead guilty. He acknowledged that his counsel
were not ineffective, but he did not want attorneys who would
work so hard. The court denied the *Marsden* motion and
arraigned defendant that same day. Defense counsel waived
reading of the complaint and entered a plea of not guilty.
Defendant objected, but counsel explained that defendant's
objection meant that he wanted the complaint read. Defendant
did not further clarify his reason for objecting. The case was one
in which the punishment might be death, and the municipal
court had no power to accept a guilty plea. At no point did the
municipal court rule that, based on section 1018, it would not
accept defendant's guilty plea.

---

[9]     As noted in footnote 3 on page 27, *ante*, defendant may also
have been precluded from waiving the preliminary hearing
because of his self-represented status.

On January 23, 1997, defendant was before a superior court judge for an in camera hearing regarding investigative funds under section 987.9, but the preliminary hearing had not occurred and the case was still before the municipal court. Defendant told the superior court judge that he wanted to "go public" and plead guilty. He expressed frustration, saying, "I don't even want to play these games anymore. I want to just go ahead, I want to enter a plea of guilty. I have a right to do so, and I wish to do so at this time." Because defendant was only before a superior court judge on a section 987.9 hearing, the superior court explained that "the issue as to whether or not you're going to plead guilty or waive a preliminary hearing is really not before me today." Defendant was insistent, and the court agreed to help defendant to achieve his aim. As noted, pleading guilty required a two-step process: (1) waiver of the preliminary hearing; and (2) entry of a guilty plea in superior court.[10] Therefore, the superior court judge said, "With your permission and request, I'll contact — or have my clerk contact — the judicial officer in Division [311 of the municipal court] and request your matter be calendared as soon as possible because you want [¶] . . . [¶] . . . to consider a change of plea or waiver of preliminary hearing . . . ." Defendant continued to insist. At one point he said, "I'm pleading guilty and that's that." The superior court judge responded, "Well, you haven't done that yet." And defendant said, "Well, I'm attempting to very, very,

---

[10]    Significantly, several times when defendant expressed his desire to plead guilty, he also said he wanted to waive the preliminary hearing. It seems, therefore, that defendant had been informed of the two-step process requiring him first to proceed through (or waive) the preliminary hearing before he could enter a guilty plea in superior court.

very hard." The court told defendant, "That part of the matter's not before me. [¶] . . . [¶] Okay. Those matters are pending in [Division] 311 [of the municipal court] [¶] . . . [¶] We're going to make arrangements to have you brought over to [Division] 311, and you can discuss your desires there." The court added, "[We]'ll do our best to get you calendared in [Division] 311 [of the municipal court] as soon as possible. I can't guarantee when that will be. As soon as we're in recess, I'm sure my clerk will call over there. If I have to call over there personally, I would do it." Thus, the superior court judge made a considerable effort to help defendant achieve his aim of pleading guilty.

Defendant argues that these efforts were misleading. He contends that the superior court could have accepted his guilty plea and instead it misleadingly sent defendant to municipal court, a court that lacked authority to accept the guilty plea. Because defendant was proceeding in propria persona, defendant argues, the superior court's instructions were unfair to him. Defendant points out that although a self-represented defendant is held to the same standard as counsel, the court is not permitted to mislead a self-represented defendant.

But the superior court did not mislead defendant. The superior court was only involved because the case was a capital case that required disbursement of investigative funds under section 987.9, and a municipal court judge was not empowered to disburse such funds. (See *Anderson v. Justice Court, supra*, 99 Cal.App.3d at p. 402.) The case was not otherwise pending in the superior court, and the superior court therefore could not have accepted defendant's guilty plea. Rather, the law required a magistrate to hold a preliminary hearing (or accept a waiver of such a hearing), and only then could defendant be held to answer in superior court and plead guilty. Defendant cites no

authority for the proposition that in 1996, when municipal court judges sitting as magistrates conducted preliminary hearings in felony cases, a defendant in a case in which the punishment might be death could enter a guilty plea in superior court without first having completed proceedings in the municipal court. Here, the superior court judge who was holding the section 987.9 hearing while defendant's case was otherwise in the municipal court could not accept defendant's guilty plea. Hence, the superior court judge did not mislead defendant; rather, he sent defendant on the only path that would have allowed defendant to achieve his stated aim.

A few days later, on January 27, 1997, the superior court held another in camera hearing and defendant's request to plead guilty was discussed. The superior court again offered to help defendant waive his preliminary hearing and plead guilty, if that was what defendant still wanted: "We will call [the municipal court magistrate assigned to your case] and see if she can work it in sometime late this morning, or sometime this afternoon."

That afternoon, defendant appeared in the department of the municipal court assigned to his case. He explained to the court, "[T]he guilt of my crime has been weighing heavily on me with a remorseful heart. I would like to offer a change of plea and enter a plea of guilty to murder in the first degree and admit the special circumstances and waive all appellate rights at this time." The prosecutor then told defendant, off the record (although later described on the record), that "by law he cannot plead guilty to a special circumstances allegation case" and "no judge can accept your plea." The court then reminded the parties that the People also have a right to a preliminary hearing, and even if defendant waived his right, the People

could choose not to do so. The prosecutor stated that the People were not prepared to waive the preliminary hearing, and so the municipal court explained to defendant that there was no choice but to proceed with that hearing. The court said: "So to have further discussions and undertake further proceedings today would be — for lack of a better word — a waste of time, and I am going to suggest that we terminate these proceedings today and that you come back on February 5th. [¶] . . . You will have had another nine days to think about this and decide whether or not you truly want to waive [the] preliminary hearing or not." Defendant agreed with that solution.

Then, on the scheduled date of the preliminary hearing in municipal court, February 5, 1997, defendant never requested to waive the hearing, and the hearing proceeded. At the end of the hearing, defendant was held to answer in superior court.

Defendant was then charged in the superior court by information filed on February 18, 1997. On February 24, 1997, defendant appeared in superior court and entered pleas of not guilty and not guilty by reason of insanity. Defendant said nothing about a desire to plead guilty.

As noted, if defendant wanted to challenge the constitutionality of section 1018, he needed to ask to plead guilty in superior court and ask the court to make a ruling based on section 1018, thus preserving the issue on appeal. He never did so. He did ask to plead guilty while his case was in the municipal court, and both the superior court judge hearing his section 987.9 motion and the municipal court magistrate assigned to his preliminary hearing attempted to assist him. But after the preliminary hearing, when defendant was held to answer in superior court, he never renewed his request to plead

guilty. On the contrary, he entered pleas of not guilty and not guilty by reason of insanity.

It is true that defendant was apparently persuaded that he could not plead guilty. The prosecutor had told him that "no judge can accept your plea." Moreover, at the hearings on October 20 and 27, 1997, he told the court that he had wanted to plead guilty but could not do so, due to section 1018, and he asked the court to allow him to inform the jury of that fact.[11]

---

[11] Defendant may have been under the impression that his previous requests to plead guilty, made when his case was in the municipal court, were denied pursuant to section 1018, but that possibility does not change the fact that, under former section 859a, the municipal court lacked statutory authority to accept defendant's guilty plea.

The concurring opinion argues that the municipal court relied on section 1018 in rejecting defendant's request to plead guilty. It focuses on the prosecutor's statement to the municipal court that "by law [defendant] cannot plead guilty to a special circumstances allegation case." The concurrence describes that statement as "an evident reference to section 1018." (Conc. opn. of Liu, J., p. 4, *post*.) But the prosecutor could equally well have been referring to the municipal court's lack of authority under former section 859a. That would explain why the prosecutor added, "I think it's [defendant's] desire to actually waive the preliminary hearing," meaning that defendant wanted to get his case out of the municipal court. To be sure, the prosecutor also said that "no judge" could accept defendant's plea, but the prosecutor may only have meant that no judge could do so at that time, before defendant was charged in the superior court. Significantly, in arguing to the municipal court that defendant was barred from pleading guilty, the prosecutor never made any reference to defendant's unrepresented status, and the prosecutor's comments nine months later in the superior court could not have influenced the municipal court, which clearly relied on the People's right to a preliminary hearing, not section 1018, in rebuffing defendant's request to plead guilty.

But, be that as it may, defendant never requested to plead guilty before the superior court, and he never asked that court to make a ruling based on section 1018, which would have preserved on appeal the issue of that statute's constitutionality. He may have been acting based on the advice that no judge could accept his plea, but he still needed to obtain a ruling and thus preserve the issue. Self-represented defendants are "held to the same standard of knowledge of law and procedure as is an attorney," and that point remains valid even in capital cases. (*People v. Clark* (1990) 50 Cal.3d 583, 625; see *People v. Espinoza* (2016) 1 Cal.5th 61, 75; *People v. Blair* (2005) 36 Cal.4th 686, 734; *People v. Mendoza* (2000) 24 Cal.4th 130, 157; *Faretta, supra*, 422 U.S. 806, 834–835, fn. 46.) "We have . . . rejected claims that the fact or likelihood that an unskilled, self-represented defendant will perform poorly in conducting his or her own defense must defeat the *Faretta* right. [¶] . . . Instead, we have accepted that the cost of recognizing a criminal defendant's right to self-representation may result ' "in detriment to the defendant, if not outright unfairness." ' [Citations.] But that is a cost that we allow defendants the choice of paying, if they can do so knowingly and voluntarily." (*People v. Mickel* (2016) 2 Cal.5th 181, 206; see *People v. Taylor* (2009) 47 Cal.4th 850, 866.)

In summary, pleading guilty before the preliminary hearing was simply not an option for defendant, because the municipal court magistrate had no power to accept a guilty plea in a capital case. The municipal court never made a section 1018 ruling prohibiting defendant from pleading guilty, because the issue of a guilty plea was not before it and, for jurisdictional reasons, could not be before it. The most the municipal court could do for defendant was accept a stipulated waiver of the preliminary hearing and then send the case to the superior

court. But the People did not agree to waive the preliminary hearing, and when the day of the preliminary hearing arrived, defendant did not renew his request to plead guilty. Nor did he renew it in the superior court after he was held to answer. Only the superior court could have made a ruling based on section 1018, and once the case got to the superior court, defendant never asked to plead guilty, so such a ruling never became necessary. We therefore reject defendant's constitutional challenge to section 1018 on the ground that the trial court never made a ruling under section 1018, and his claim is therefore forfeited.

### 3. *Validity of Waiver of Right to Counsel*

Defendant challenges the validity of his waiver of his right to counsel, making several arguments. None of his arguments has merit.

#### a. *Municipal Court's Asserted Error in Denying Defendant's* Marsden *Motion without Sufficient Inquiry*

Defendant first contends his waiver of the right to counsel was induced by the municipal court's errors during his first *Marsden* hearing on October 30, 1996, when he said that he did not want that vigorous of a defense and added that he wanted to plead guilty. He asserts that the court made no inquiry into his intent to plead guilty or his conflict with counsel, and it then permitted counsel to enter a not guilty plea despite defendant's stated desire to plead guilty. He argues that the court's actions placed him in an unconstitutional dilemma of either (1) defending himself with counsel who would not "accede to his fundamental and personal right to control his defense by pleading guilty and pursuing a case for life at penalty," or (2) defending himself without counsel. In these circumstances, he

argues, there was no valid waiver of the right to counsel. He asserts that the unaddressed and unresolved conflict he had with his counsel negated the required showing that his waiver was voluntary and intelligent.

Defendant is wrong. After defendant made an oral *Marsden* motion, the municipal court held a *Marsden* hearing in chambers. The court started the hearing by asking defendant to describe why he believed one or both of his attorneys were not rendering competent or reasonable representation. Defendant explained that he did not agree with "their idea of what they want to do tactical-wise" and that he did not want them to call witnesses over his objection. Defendant's complaints regarding trial preparation and strategy were tactical disagreements, as defendant conceded in the hearing, which do not by themselves constitute an irreconcilable conflict. (*People v. Cole* (2004) 33 Cal.4th 1158, 1192 (*Cole*); see *People v. Bolin* (1998) 18 Cal.4th 297, 334 [whether to call certain witnesses is a matter of trial tactics].) Although the *McCoy* court acknowledged a defendant's fundamental right to choose the objective of his or her defense, the court also acknowledged that it is defense counsel's job to determine how best to achieve a client's objectives. (*McCoy*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 1508].)

Defendant did not indicate to the municipal court that the conflict he had with counsel was so serious that he would consider representing himself just to terminate his relationship with his current public defenders, nor did defendant say that his conflict with counsel concerned whether or not to enter a guilty plea. On the contrary, defendant's main concern was about whether certain witnesses would be called at the penalty phase. When the municipal court said that the penalty phase was still a long way off, defendant responded that it was not a long way

off, because he planned to waive the preliminary hearing and plead guilty, which meant the penalty phase would occur relatively soon. He added that his dispute with counsel concerned how to conduct the penalty phase. His counsel wanted "to check all avenues," and defendant didn't want that. He also said that he didn't want to represent himself and allow the prosecutor "to just walk all over me." He continued, "I'm going to keep these counsel. I'm not saying they are ineffective." Defendant's comments contradict his assertion that his waiver of the right to counsel was due to a conflict over whether he should plead guilty. On the contrary, what he told the court was that the conflict was over how the penalty phase should be conducted, and the court acted within its discretion in finding no irreconcilable conflict requiring counsel's replacement.

### b. *Failure to Advise that Defendant Could Not Plead Guilty*

Defendant next contends his waiver was invalid because the municipal court failed to advise him that even if he waived his right to counsel, he still could not plead guilty. He notes that his request to waive counsel "came one week after counsel was allowed to thwart [his] stated intent to plead guilty," suggesting that the court should therefore have known that his reason for waiving counsel was his desire to plead guilty. He points out that section 1018 prohibits a capital defendant from pleading guilty without consent of counsel, and he argues that court failed to ensure he was aware of the rule.

"The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and

voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069-1070.) "On appeal, we examine de novo the whole record—not merely the transcript of the hearing on the *Faretta* motion itself—to determine the validity of the defendant's waiver of the right to counsel." (*Id*. at p. 1070.)

Defendant here asserts, in effect, that the court did not ensure he was aware of all of the disadvantages of self-representation; namely, that he would not be able to plead guilty because such a plea requires the consent of counsel under section 1018. Defendant argues that the timing of his *Faretta* request, made only one week after he attempted to plead guilty, demonstrated that his request stemmed from a mistaken belief that a guilty plea would be accepted after counsel was discharged.

Defendant cites no authority for the proposition that when a defendant waives the right to counsel, the trial court must inform the defendant of every possible specific disadvantage that might later flow from the waiver. Countless disadvantages might result from a waiver of the right to counsel, and a trial court could not possibly predict each of those disadvantages in advance. Therefore, the trial court need only inform the defendant in general terms of the most common disadvantages. (See *People v. Riggs* (2008) 44 Cal.4th 248, 277–278 (*Riggs*); *People v. Lopez* (1977) 71 Cal.App.3d 568, 572–573.)

Nor on this record was the municipal court made aware of the need to inform defendant that he could not plead guilty if he represented himself. On November 7, 1996, when defendant made his oral motion to proceed in propria persona, he did not

say anything about an intent to plead guilty. Quite the opposite: Defendant's only concern about representing himself was whether he would have the ability to obtain funding for an investigator to assist him. It is true that defendant had told the court one week earlier, during the *Marsden* hearing, that it was his plan to waive the preliminary hearing and plead guilty. However, when the court arraigned defendant after the hearing, counsel entered a plea of *not* guilty. Defendant then said, "Over my objection," but counsel clarified that defendant's objection related to the reading of the complaint, and defendant did not dispute that point. Those facts do not support defendant's assertion that on the day of the *Marsden* hearing "counsel was allowed to thwart [his] stated intent to plead guilty."

A week later when defendant waived his right to counsel, defendant's actions were too ambiguous for the court to have reasonably known that the reason he sought to represent himself was that he wanted to plead guilty. Furthermore, when defendant later learned that he would be unable to plead guilty as a self-represented defendant, he reaffirmed his desire to continue without counsel.

We conclude that the record " 'as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case' " (*Riggs, supra,* 44 Cal.4th at p. 276), and that because defendant did not make his intent clear, the municipal court was not obligated to specifically inform defendant that he would not be able to plead guilty if he waived his right to counsel.

### c. *Sufficiency of the Court's Inquiry*

Defendant further contends that the municipal court's *Faretta* inquiry was insufficient to support a valid waiver of the right to counsel in a capital case. He asserts the court did not specifically inquire into his understanding of capital case proceedings and did not make him aware of the specific dangers and disadvantages of proceeding without counsel in capital proceedings or of the fundamental legal rights that would be affected by proceeding without counsel. He also notes that his *Faretta* form did not advise him of such disadvantages. We conclude the court's inquiry was sufficient.

As noted, the trial court could not possibly predict every disadvantage that might flow from a waiver of the right to counsel, and therefore it need only inform the defendant in general terms of the most common disadvantages. We have upheld warnings similar to those that defendant here received. (*Riggs, supra,* 44 Cal.4th at pp. 277–278 [advisements were adequate where record showed the defendant was aware that defending himself against capital charges was a complex process involving extremely high stakes and that his ability to defend himself might be hampered by his incarceration and lack of training]; *People v. Blair* (2005) 36 Cal.4th 686, 709–710 [advisements were adequate where record reflects that the defendant understood the nature of the charged offense, the nature of a capital proceeding and penalty phase, and was advised by the court to receive help from a lawyer].)

On August 22, 1996, the municipal court discussed at length with defendant his desire to plead guilty. Defendant explained that he had been involved in several cases in the criminal justice system and had previously represented himself

against three felony charges, none of which went to jury trial. He understood that he would be treated the same as an attorney and would receive no special privileges. He affirmed that he could read and understand English "very well" and that he had a "healthy, clear mind." On November 7, 1996, defendant executed a written waiver of his right to counsel. The waiver form emphasized that it was "almost always unwise to represent yourself" and reminded defendant that he would be facing a skilled and experienced prosecutor. During the oral colloquy, defendant affirmed his awareness that he faced "murder with special circumstances and [that] the maximum term is the death penalty."

The record here reflects that defendant was aware of the charges against him, that he knew he faced both a guilt phase and, if found guilty, a penalty phase, that he could expect to have access to only limited resources due to his incarceration, and that the assistance of an attorney was highly recommended. The court's inquiry was sufficient.

### d. Requests to Reappoint Counsel

Defendant next asserts the trial court erred by failing to address and grant his requests on January 23 and 27, 1997, for reappointment of counsel.

The hearing on January 23 was an in camera hearing before a superior court judge who was overseeing disbursement of investigative funds under section 987.9. At the start of the hearing, the court explained that it had received notice that defendant had violated the terms of the order granting him jail privileges. Defendant replied that he wished to plead guilty. He expressed frustration with his lack of a working computer and difficulty placing unmonitored phone calls. He explained that

he did not want the government to "run over" him and did not "want to play these games anymore." He told the court that he preferred to plead guilty and have the public defender's office reappointed to represent him during the penalty phase. Defendant complained that he had to "keep coming to this court and begging" for phone calls, materials, and investigation reports and did not believe the court was sincere in its efforts to assist him. Defendant asked insistently to "go public" and allow him to change his plea. The court, which was addressing only the disbursement of investigative funds under section 987.9, said, "That part of the matter's not before me." As noted, the court told defendant he would need to discuss his desire to change his plea in the proper department, and the court offered to help him do so. (See *ante*, p. ___.)

Defendant returned to the superior court on January 27, 1997, for an in camera hearing on his alleged jail violation and to further discuss his displeasure with his assigned investigator. The court revoked defendant's self-representation jail privileges and closed the hearing by again offering to help defendant waive his preliminary hearing and plead guilty, if that was what defendant still wanted: "We will call [the municipal court judge assigned to your case] and see if she can work it in sometime late this morning, or sometime this afternoon."

That afternoon, defendant appeared in the department of the municipal court assigned to his case and asked to plead guilty. As already discussed, the municipal court had no authority to accept a guilty plea in a capital case. Instead, if defendant insisted on pleading guilty, the court would need to proceed with the preliminary examination, hold defendant to answer, and then defendant would have to plead guilty in the superior court. The prosecutor told defendant that the law

prevented him from pleading guilty. The municipal court then explained that the People were not prepared to waive the preliminary hearing, and therefore there was no choice but to proceed with that hearing. The court said, "I am going to suggest that we terminate these proceedings today," adding that defendant should return on the day scheduled for the preliminary hearing, having considered the matter further. Defendant agreed with that solution.

A motion to abandon self-representation and have counsel reappointed must be unequivocal. (*People v. Lawrence* (2009) 46 Cal.4th 186, 193 (*Lawrence*); see *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002 (*Lewis and Oliver*).) "Equivocation . . . may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions are the product of whim or frustration." (*Lewis and Oliver, supra,* 39 Cal.4th at p. 1002.) A trial court's denial of a *Faretta* revocation request is reviewed for abuse of discretion. (*Lawrence*, at p. 192.)

At the hearing on January 23, 1997, defendant did not simply request to have counsel reappointed. Instead, he expressed an intent *first* to plead guilty, and *only then* to have counsel reappointed to handle the penalty phase. As already discussed, however, in order to plead guilty, defendant needed to proceed through the preliminary hearing (or waive it), be held to answer in superior court, and then enter his guilty plea in that court. The superior court, which was handling only disbursement of investigative funds under section 987.9, did not fail to address defendant's request. The court appropriately informed defendant that the matter of his pleading guilty was not before it and that he needed to raise that issue in the proper

department. It then arranged a hearing in the division of the municipal court that was assigned to defendant's preliminary hearing. Because defendant's request to have counsel reappointed was expressly conditioned on his pleading guilty, and because he could not plead guilty without proceeding through the preliminary hearing (or waiving it), the court properly directed defendant to the division of the municipal court where he could begin that process.

On January 27, 1997, when defendant was before the municipal court division that was handling his preliminary hearing, defendant again requested to plead guilty, but he did not repeat his request to have counsel reappointed. Because the People were not willing to waive the preliminary hearing, the court had no choice but to proceed with that hearing as scheduled.

Contrary to defendant's claim, the trial court did not fail to address his request to plead guilty and have counsel reappointed. Instead, it did what was within its power to assist defendant. We conclude there was no error.

### e. Waiver of Right to Counsel after Defendant Was Held to Answer in Superior Court

Lastly, defendant asserts he did not validly waive counsel on March 14, 1997, when the superior court took a second *Faretta* waiver. The prosecutor requested this second waiver of defendant's right to counsel, because defendant's previous waiver was before the prosecution had formally declared its intent to pursue the death penalty.

At the hearing on March 14, 1997, the superior court advised defendant that he had the right to a speedy and public trial, and the right to a trial by jury. The court also advised

defendant that he had the right to use the court to subpoena witnesses or records he might need and the right to confront in open court all witnesses called to testify against him. The court then noted that, according to a minute order dated February 28, another judge had gone "through all this" with defendant. Defendant clarified that "those were in camera hearings." The court asked, "Were all these rights explained to you at that time?" In response, defendant said, "Yeah, I'm fully aware of my rights. I'm making a knowing and intelligent waiver of my rights. I understand that this is a death penalty case and that the minimum term, mandatory minimum is life without the possibility of parole. I am also aware that by pleading not guilty and not guilty by reason of insanity, I could spend the rest of my life in a mental institution if a jury so finds, but I'm willing to fill out your petition here." The court stated, "As long as this has all been gone over with you by [the other judge], I'm satisfied." Defendant then signed the *Faretta* waiver for the court.

Defendant contends the trial court's failure to readvise him of his rights violated section 987, subdivision (b), which provides that if a capital defendant appears for arraignment without counsel, the court shall inform him that he shall be represented by counsel at all stages of the preliminary and trial proceedings.

In *People v. Crayton* (2002) 28 Cal.4th 346, a noncapital defendant waived his right to counsel in municipal court. After the defendant was held to answer, the superior court did not readvise him of his right at his subsequent arraignment, as is required by section 987, subdivision (a). We held that when "a defendant has been fully informed of his or her right to counsel at all stages of the proceedings (including trial), and voluntarily

and knowingly has invoked the right to represent himself or herself throughout all the proceedings, the trial court's failure to provide a new advisement and obtain a renewed waiver at the arraignment (as required by section 987) does not operate to terminate or revoke the defendant's validly invoked constitutional right to represent himself or herself at trial." (*People v. Crayton*, at p. 365.) We further held that a trial court's error in failing to comply with section 987 was susceptible to a harmless error analysis. (*People v. Crayton*, at p. 365.) We noted that a review of the record will reveal whether, despite the absence of an explicit advisement by the superior court at arraignment, the defendant was aware that he or she had the right to appointed counsel at subsequent proceedings and whether an explicit advisement at the arraignment would have been likely to lead the defendant to reconsider the decision to represent himself or herself. (*Ibid.*)

The same rule applies to capital defendants under section 987, subdivision (b). Where, as here, the record reveals that the defendant was aware that he had the right to appointed counsel at subsequent proceedings and an explicit advisement at arraignment would not have been likely to lead to the defendant's reconsidering his decision to represent himself, the court's failure to readvise the defendant is harmless beyond a reasonable doubt. Defendant was well aware that he had the right to appointed counsel at all stages. When the municipal court took his *Faretta* waiver on November 7, 1996, the court expressly stated that defendant's motion "is to represent yourself throughout the proceedings, prelim, pretrial, trial, *everything*?" Defendant replied, "Yes, sir." Defendant also repeatedly reminded the court during in camera hearings that he wanted to represent himself, that he was lead counsel on his

case, and that he did not want the court to handle matters through his advisory counsel. He also signed a second written waiver of his *Faretta* rights. And when the court attempted to readvise defendant of his rights, he told the court that he was "fully aware" of his rights and was making a "knowing and intelligent" waiver of those rights. We conclude that any possible error was harmless under any standard.

### B. Failure to Suppress Statements

Investigators first interviewed defendant shortly after his arrest on June 14, 1996. Officer Mark Steen advised defendant of his right to remain silent, that anything he said could be used against him in court, of his right to have an attorney present before or during any questioning, and that if he could not afford an attorney, one would be appointed before questioning. Following each advisement, Steen asked defendant if he understood. To each question, defendant replied, "Yes, sir." Steen then proceeded to question defendant about his involvement in the crime.

Early in the questioning, defendant said, "Hey, when am I going to get a chance to call my lawyer. It's getting late, and he's probably going to go to bed pretty soon." Steen replied, "Your lawyer? Well you can call your lawyer after we're done in our facility." Defendant said, "Oh, okay. So what do we got to do in our facility here?" Steen explained, "Well, we're conducting this interview." When defendant asked if they could finish the interview the following day, Steen replied, "Um, we can continue talking tomorrow; however, we're not going to continue the interview." Steen then continued asking defendant about the murder.

Eleven days later, on July 25, 1996, defendant sent Officers Steen and Lozano a letter requesting to meet. The investigators spoke with defendant at the jail on August 12, 1996. Lozano advised defendant that he was represented by the public defender, who had invoked defendant's right to remain silent. Lozano asked if defendant would like to waive his right to have an attorney present. Defendant replied, "I waive that, and I have since fired him."[12] Lozano advised defendant of his *Miranda* rights, and defendant signed a waiver. Lozano then interviewed defendant.

On June 23, 1997, defendant filed a pretrial motion to suppress his statements from the June 14 interview. He also moved to dismiss the information on the grounds that his confession was obtained in violation of *Miranda,* and without the confession, there was insufficient evidence to hold him to answer on the murder charge. On September 8, 1997, defendant filed a motion to suppress both the June 14 confession and his statements from the August 12 interview. He argued the August statements "still carried the taint" of the June 14 interview at which the investigators engaged in misconduct by failing to notify his counsel when he requested to speak with them. Defendant further argued that his "known history of mental illness and current treatment with psycho[tropic] medications are factors to consider."

At a hearing on September 26, 1997, the trial court denied the motions. The court found that defendant's statements

---

[12] Actually, defendant had submitted, on July 16, 1996, a handwritten motion requesting to proceed in propria persona. Defendant later withdrew that request, but he then made a new request, which the court granted on November 7, 1996.

during the June 14 interview did not constitute a clear request for an attorney. Rather, his inquiry into when he could call his attorney indicated that he was "desirous of speeding up the interview so he [could] call his lawyer when the interview was over. There is certainly nothing close to a clear request for an attorney." The court found that because defendant initiated contact before the August interview and signed written waivers of the presence of counsel and of his *Miranda* rights, "defendant can hardly complain that his statements were coerced, involuntary, or in violation of his right to counsel." The court further found that defendant presented no evidence of any mental defect that would preclude him from understanding and waiving his rights.

Defendant asserts the trial court erred in failing to suppress his statements from the June 14 interview because he did not validly waive his right to counsel. He further asserts the trial court erred in failing to suppress statements from the August 12 interview because there was no break in the causal chain from the erroneous first interrogation. Lastly, defendant asserts that the state violated his Sixth Amendment rights "by approaching appellant [on August 12] without first contacting his attorney," and he further asserts that his mental illness affected his ability to waive his rights. We disagree.

In *Miranda, supra,* 384 U.S. 436, the United States Supreme Court set forth prophylactic measures to protect an individual's right against self-incrimination from curtailment under the "inherently compelling pressures" of custodial interrogation. (*Id.* at p. 467.) A suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he

cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Id.* at p. 479.) After a suspect has heard and understood these rights, he or she may waive them. (*People v. Tate* (2010) 49 Cal.4th 635, 683.) The prosecution, however, bears the burden of showing that the waiver was knowing, voluntary, and intelligent under the totality of circumstances. (*People v. Linton* (2013) 56 Cal.4th 1146, 1171; see *Maryland v. Shatzer* (2010) 559 U.S. 98, 104.)

On appeal, we view the evidence in a light most favorable to the order denying the motion to suppress. (*People v. Tully* (2012) 54 Cal.4th 952, 979.) "Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Ibid.*)

In *People v. Whitson* (1998) 17 Cal.4th 229, a police officer interviewed the defendant on three separate occasions. At the beginning of each interview, the officer advised the defendant of his rights under *Miranda* and asked whether he understood them. Each time, the defendant responded that he did. The officer then proceeded to question the defendant. (*Id.* at pp. 237–239.) We concluded the defendant's statements were voluntary, noting that the record was devoid of any suggestion that the police resorted to physical or psychological pressure to elicit them. (*Id.* at pp. 248–249.) We concluded the defendant was aware of the rights he was waiving and the consequences of his decision to do so, observing that there was no evidence that during any interview his judgment was clouded or otherwise impaired. (*Id.* at p. 249.) We further concluded that the defendant's waiver was intelligent, noting that there was no evidence that he lacked sufficient intelligence to understand his rights or the consequences of waiving them. (*Id.* at p. 250.) We held: "Although the police officers did not obtain

an *express* waiver of defendant's *Miranda* rights, decisions of the United States Supreme Court and of this court have held that such an express waiver is not required where a defendant's actions make clear that a waiver is intended." (*Ibid.*; see *North Carolina v. Butler* (1979) 441 U.S. 369, 374–375.)

As in *Whitson*, ample evidence supports a finding here that defendant's waiver was voluntary, knowing, and intelligent. Officers Steen and Lozano explained each *Miranda* right to defendant, after which he indicated that he understood. Following a complete admonition, defendant began to discuss his role in the murder. His actions made clear that a waiver was intended.

Defendant also did not unequivocally invoke his right to counsel when he subsequently asked, "Hey, when am I going to get a chance to call my lawyer? It's getting late, and he's probably going to go to bed pretty soon." When a defendant has waived his *Miranda* rights and agreed to speak with police, any subsequent invocation of the right to counsel must be unequivocal and unambiguous. (*Davis v. United States* (1994) 512 U.S. 452, 461–462.) "[A]fter a knowing and voluntary waiver, interrogation may proceed 'until and unless the suspect *clearly* requests an attorney.' " (*People v. Williams* (2010) 49 Cal.4th 405, 427 (*Williams*).) Defendant's statement that it was getting late and his question about when he would get to call his lawyer did not amount to an unequivocal and unambiguous request for counsel. A reasonable officer in Steen and Lozano's position would have concluded that defendant's remark expressed concern over the length of the interview and a desire to contact counsel when the interview was over. Defendant never said that he wanted to stop the interview immediately and consult counsel.

We conclude that defendant's statements from the June 14 interview were properly obtained. It follows that his subsequent statements at the August 12 interview did not carry any taint from the previous interview. Furthermore, the investigators readvised defendant of his *Miranda* rights before beginning the August 12 interview, and defendant signed a waiver.

Defendant's contention that the August 12 interview violated his Sixth Amendment right to counsel also fails. Officer Lozano reminded defendant that the investigators were present for the interview because defendant had initiated contact through a letter indicating a desire to speak with them. While advising defendant of his *Miranda* rights, Lozano said, "You are being represented, at this point, that we know of, by a public defender, okay, . . . who has invoked your right to remain silent with the court. He's filed papers to that effect, . . . that you are just . . . [to] remain silent, okay? You have the right to have your attorney . . . present while we talk to you, okay? Uh, . . . do you wish to have him here at this time, or do you waive that right to have that attorney . . . here at this time?" Defendant replied, "I waive that, and I have since fired him."[13]

"The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." (*Maine v. Moulton* (1985) 474 U.S. 159, 176.) A suspect has the right, however, to knowingly and intelligently waive the right to counsel, especially if the accused himself initiates such communication. (*Patterson v. Illinois* (1988) 487 U.S. 285, 291.) Defendant

---

[13] As noted, defendant had filed a motion to proceed in propria persona, but the court had not ruled on it. Defendant later withdrew the motion.

initiated contact with the investigators when he sent them a letter requesting to meet. He was then thoroughly advised of his right to have counsel present during the interview, and he unequivocally waived that right. Moreover, his waiver was not invalidated by his asserted mental illness. Defendant relies on a declaration he submitted to the trial court with his motion to suppress, in which a psychologist declared that defendant was "mentally ill" and that his letter requesting a meeting with the investigators "was a product of this deteriorated mental state." On review of this declaration, the trial court expressed concern over the lack of cross-examination by the People and found that the psychologist's statement was "a legal conclusion that would not be admissible, as it is without foundation." In its written order, the trial court stated that defendant failed to present evidence of any mental defect that would prohibit him from waiving his rights.

The record does not demonstrate that defendant failed to understand or validly waive his rights. We conclude that substantial evidence supports the trial court's findings.

## C. Failure to Suppress Evidence

Santa Ana Police Corporal Richard Reese testified at trial that he arrested defendant on the evening of June 14, 1996. After the arrest, Reese and other law enforcement personnel conducted a parole search of defendant's camper. They located a .32-caliber revolver in its holster, hidden under a blanket. Reese testified that they found five live rounds in the revolver.

Defendant objected and asked the trial court to strike Reese's testimony. Outside the jury's presence, defendant explained the basis of his objection: "No probable cause for the search. The evidence that he's attempting to introduce is the

object of an illegal search and seizure. I believe that Officer — Corporal Reese testified that the defendant was already in custody [and hence no longer on parole], and . . . I believe that there was no exigent circumstances for them to conduct a search without a search warrant. They could have obtained a search warrant, so on and so forth." The prosecutor replied that if defendant wanted to suppress the evidence of the search, "he had ample time before the proceedings" to do so. He argued the search was actually conducted by parole agent Jan Moorehead pursuant to a parole condition. The prosecutor explained that he "did not want to raise the specter of a parole search" before the jury, and he had only vaguely questioned Reese as to whether other investigators were present, so as not to reveal to the jury that defendant was on parole. Defendant replied that he was in custody at the time of the search and no longer on parole.

The court stated that the objection was "extremely tardy" and asked defendant why he waited until mid-trial to raise the issue. Defendant explained that he was under the assumption that the officers had conducted the search pursuant to a warrant, but he realized after Reese's testimony that they did not have a warrant. The prosecutor responded that an evidence list from the parole search had listed a revolver, holster, and bullets, thus informing defendant that the gun was found during the parole search, not during a later search of the same camper, done pursuant to a warrant.

The court denied defendant's motion, stating: "If there's nothing in any of the discovery to indicate that the weapon was taken during a search pursuant to a warrant, I'm somewhat confused as to how you would not be aware that it was taken by Corporal Reese during his search of the camper." Defendant

explained that the documents confused him and that he did not purposefully wait to make the argument. The court replied, "The problem presented here is that if I were to allow this motion to be heard at this time, it would be granting favoritism to an individual who decided to represent himself. I don't believe that it's fair to the process of justice to do that. The defendant, having chosen to represent himself, is bound to know the rules and procedures. I frankly can't see any justification for waiting mid-trial to make a motion to suppress."

Section 1538.5, subdivision (a), provides that a defendant may move to suppress as evidence any tangible thing obtained as a result of an illegal search or seizure. A defendant is not permitted to raise a search and seizure issue for the first time during trial, however, unless the opportunity for the motion did not previously exist or the defendant was not aware, prior to trial, of the grounds for the motion. (§ 1538.5, subd. (h); *People v. Brooks* (1980) 26 Cal.3d 471, 476.)

We conclude that sufficient evidence supported the trial court's finding that defendant's motion to suppress the evidence was untimely. The discovery provided to defendant clearly indicated that the gun was located during Reese's post-arrest search of the camper, not during the subsequent execution of the search warrant. Defendant said the paperwork confused him; he did not claim, however, that he had been provided erroneous or incomplete pretrial discovery and therefore was incapable of discovering the grounds for his motion. Defendant's failure to bring his motion to suppress prior to trial therefore does not fall within the exceptions recognized in section 1538, subdivision (h).

## D. Disclosure of Reporter's Unpublished Notes

Defendant contends the trial court violated his right to obtain evidence when it refused to require a reporter to disclose her notes from her jailhouse interview with him. He asserts application of the newsperson's shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070) limited his ability to challenge testimony from Marla Jo Fisher, a reporter with the Orange County Register (the Register).

On June 15, 1996, the day after defendant's arrest, Fisher visited the jail to conduct an interview. After Fisher identified herself to defendant and explained the purpose of her visit, he agreed to speak with her. He admitted that he was attempting to rob the HomeBase store and that he shot Wilson. The following day, the Register published an article containing several statements and admissions from defendant.

The prosecution subpoenaed Fisher to testify at trial. Defendant in turn subpoenaed the Register for any notes and materials it had regarding Fisher's interview. The Register provided a copy of the published article. After defendant argued that the Register wanted to "quash the unpublished" notes, the trial court issued an order to show cause why the Register should not produce the requested documents. In response, the Register, on its own behalf and on behalf of Fisher, moved for a protective order limiting the scope of subpoenas to information not protected under the California reporter's shield law and also the First Amendment to the United States Constitution. Defendant opposed the motion, arguing that statements he made during the interview would establish mitigating circumstances relative to the penalty determination, might establish that the murder was not in furtherance of a robbery,

and might be relevant for the sanity phase. He further argued that Fisher published his statements out of context, and he needed the ability to impeach her credibility and to show that she was acting as a government agent.

At a hearing on the matter, the court concluded that defendant could cross-examine Fisher regarding the circumstances surrounding the interview, including statements he may have made that were not published. The court also concluded, however, that it would not order Fisher to turn over her notes at that time, stating that making such an order would depend on her testimony and whether she relied on those notes in refreshing her recollection while testifying.

The trial court then conducted another hearing before Fisher testified to determine whether she would be using any unpublished notes to refresh her recollection. Attorney Alec Barinholtz appeared on behalf of Fisher and the Register's parent company. Fisher did not testify regarding whether she had taken notes during her interview with defendant. Rather, she said that prior to coming to court, she had refreshed her recollection by reviewing the published newspaper article and watching a videotape of a televised interview. The court ruled that because Fisher did not rely on any notes to refresh her recollection, any notes she may have taken were shielded by law. The court concluded that defendant could "inquire about matters that were discussed during his interview with her. . . . Well, anything that he recalls that he wants to talk to her about that occurred during the course of the interview is subject to be examined upon."

Article I, section 2, subdivision (b) of the California Constitution provides, as relevant to this case, that a

"reporter . . . shall not be adjudged in contempt by a judicial, legislative, or administrative body . . . for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." The constitutional provision is codified in section 1070 of the Evidence Code. This law, known as the "shield law," "protects a newsperson from being adjudged in contempt for refusing to disclose either: (1) unpublished information, or (2) the source of information, whether published or unpublished." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 797 (*Delaney*).) A newsperson's immunity, however, must yield to a criminal defendant's constitutional right to a fair trial. (*Id.* at p. 805; *People v. Charles* (2015) 61 Cal.4th 308, 325 (*Charles*).) " 'In order to compel disclosure of information covered by the shield law, the defendant must make a threshold showing of a reasonable possibility that the information will materially assist his defense. The showing need not be detailed or specific, but it must rest on more than mere speculation.' " (*People v. Ramos* (2004) 34 Cal.4th 494, 526 (*Ramos*).)

We have previously "set forth a number of factors to guide the trial court in balancing the interests of a criminal defendant seeking to overcome the immunity granted by the shield law with the newsperson's interests. Those factors are: (a) 'whether the unpublished information is confidential or sensitive'; (b) whether 'the interests sought to be protected' by the law would be thwarted by disclosure; (c) 'the importance of the information to the criminal defendant'; and (d) '[w]hether there is an alternative source for the unpublished information.' " (*Charles, supra,* 61 Cal.4th at p. 325; see *Delaney, supra,* 50 Cal.3d at pp. 810–811.)

Defendant asserts that the shield law should not apply because he was both the source of the unpublished information and the person seeking its disclosure. In *Delaney, supra*, 50 Cal.3d 785, we acknowledged that when "the criminal defendant seeking disclosure is himself the source of the information, it cannot be seriously argued that the source (the defendant) will feel that his confidence has been breached. The reporter's news-gathering ability will not be prejudiced." (*Id.* at pp. 810–811.)

Before the court may weigh the interests sought to be protected by the shield law, however, the defendant must first make the threshold showing that there is a reasonable possibility that the information will materially assist his defense. In *Ramos, supra*, 34 Cal.4th 494, a newspaper reporter interviewed the defendant about the charges pending against him. The newspaper published the interview. When the prosecution subpoenaed the reporter, he filed a motion to quash on the ground that the information the prosecution sought was protected by the shield law. (*Id.* at p. 523.) Following an in camera hearing, the trial court decided the defense could cross-examine the reporter on his observations of the defendant's mental status and demeanor, but it did not require the reporter to produce his notes of the interview. (*Id.* at p. 524.)

We concluded that the defendant's assertion that the reporter's notes were material to his defense was mere speculation. (*Ramos, supra*, 34 Cal.4th at p. 527.) The defendant had not established that the notes contained anything different from the reporter's testimony, and the record did not suggest the notes contained anything of substance that the jury had not already heard. (*Ibid.*) Because the defendant failed to meet the threshold showing, we did not balance the *Delaney* factors to determine whether disclosure was required,

and we found the trial court did not abuse its discretion in using the shield law to protect the reporter's notes. (*Ibid*.)

Here, defendant has likewise failed to make a threshold showing that there was a reasonable possibility, beyond mere speculation, that the information contained in Fisher's notes would have materially assisted his defense. Indeed, he has not established that such notes even existed. Although he asserted in his motion that he had been misquoted in various passages of the article, the statements attributed to him in the article were consistent with his statements to the investigators. Defendant's vague assertion that he needed the notes to "test her credibility" does not show a reasonable possibility that the notes would have materially assisted his defense. He has not made an adequate showing that any notes made by Fisher contained anything different from her testimony or from what the jury had already heard.

Further, the trial court permitted defendant to cross-examine Fisher on "all of the circumstances" surrounding the interview, including statements defendant may have made that were not published. As the court told defendant during the hearing, "Considering the interview was of you, I think there is significant areas of testing the credibility available to you."

The trial court likewise did not err when it denied defendant's motion to strike Fisher's testimony. For the reasons discussed above, defendant was not, as he asserts, unable to effectively cross-examine Fisher without her notes.

## E. Instructional Error

### 1. Instruction on First Degree Murder

Defendant contends that the instructions permitting him to be convicted of first degree murder on a theory of either

premeditated murder or felony murder violated his rights under the Eighth and Fourteenth Amendments to the federal Constitution because he was not charged with first degree murder. He asserts that because he was charged only with second degree murder under section 187, he cannot be found guilty of first degree murder. He further asserts that the trial court committed reversible error by failing to require the jury to unanimously agree on the theory of first degree murder. We have repeatedly rejected substantially similar claims and do so again here. (*People v. Geier* (2007) 41 Cal.4th 555, 592; *Cole, supra*, 33 Cal.4th at p. 1221; *People v. Hughes* (2002) 27 Cal.4th 287, 369; *People v. Kipp* (2001) 26 Cal.4th 1100, 1132; *People v. Silva* (2001) 25 Cal.4th 345, 367; *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395.) Defendant offers no persuasive reason to revisit these holdings.

### 2. *Attempted Robbery–Murder Instruction*

Defendant contends the trial court erred when it instructed the jury on attempted robbery–murder. He asserts the instruction was "tantamount to a directed verdict on the issue of whether the killing occurred during the commission of attempted robbery, because the undisputed evidence showed that [he] fatally shot the victim long before he had reached a place of 'temporary safety.' "

The court instructed the jury in the language of CALJIC Nos. 8.21: "The unlawful killing by a defendant of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime." It also instructed the jury in the language of CALJIC No. 8.21.1: "For

the purposes of determining whether an unlawful killing has occurred during the commission or attempted commission of a robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time. An attempted robbery is still in progress after the attempted taking of the property while the perpetrator is fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator. An attempted robbery is complete when the perpetrator has eluded any pursuers and has reached a place of temporary safety."

Defendant asserts that the evidence showed the attempted robbery and murder were two distinct crimes, not one continuous transaction, and that the instruction erroneously removed a factual issue from the jury's consideration by directing the jury to conclude that the attempted robbery was still in progress when he shot the victim. He relies on *People v. Sakarias* (2000) 22 Cal.4th 596 (*Sakarias*). In that case, the jury asked the court for clarification regarding when a burglary begins and ends. The court responded, " 'Although it is alleged that the killing in the present case occurred sometime after it is alleged the defendant entered the house, if the jury finds that the defendant committed burglary by entering the house with the intent to steal, the homicide and the burglary are parts of one continuous transaction.' " (*Id.* at p. 623.) In *Sakarias*, we concluded that the trial court's response relieved the jury of its obligation to determine whether all the elements of first degree murder and the burglary-murder special circumstance had been proven beyond a reasonable doubt, but we further concluded that the error was harmless. (*Id.* at pp. 624–625.)

Subsequent to our decision in *Sakarias*, we have held CALJIC No. 8.21.1 to be a correct statement of the law. (*People*

*v. Debose* (2014) 59 Cal.4th 177, 204–205.)  Defendant concedes that CALJIC No. 8.21.1 "may be a proper instruction under appropriate circumstances," but he asserts that the instruction was erroneous in this situation.  He is mistaken.  In *Sakarias*, the trial court's written response to the jury's question was erroneous because it did not instruct the jury that it must decide for itself whether the homicide and burglary were part of a single continuous transaction.  (*Sakarias*, *supra*, 22 Cal.4th at p. 626.)  The CALJIC No. 8.21.1 instruction given here did not suffer from the same flaw.  The jury was left to decide whether the attempted robbery was complete before the murder took place.

### 3. *Special Circumstance Instruction*

Defendant contends the trial court erroneously instructed the jury on the special circumstance allegation of attempted robbery–murder.  He contends that the instruction, combined with CALJIC No. 8.21.1, permitted the jury to find the special circumstance true without finding that he killed the victim while engaged in an attempted robbery.  We reject the claim.

Over defendant's objection, the trial court instructed the jury using a modified version of CALJIC No. 8.8.17 as follows, with the modified portion in italics:  "To find that the special circumstance, referred to in these instructions as murder in the commission of attempted robbery, is true, it must be proved: 1. The murder was committed while the defendant was engaged in the attempted commission of a robbery, or the murder was committed during the immediate flight after the attempted commission of a robbery by the defendant and 2. The murder was committed *in the course of* the commission of the crime of attempted robbery or to facilitate the escape therefore or to

avoid detection. In other words, the special circumstance referred to in these instructions is not established if the attempted robbery was merely incidental to the commission of the murder.”

The standard jury instruction at the time of trial read, “The murder was committed *in order to carry out or advance* the commission of the crime . . . .” (Italics added.) Defendant asserts that the evidence supported instructing the jury with the standard “carry out or advance” language, because the jury could have reasonably concluded that any intent to steal no longer existed when he shot the victim. We have previously held, however, that there “is nothing magical about the phrase ‘to carry out or advance’ the felony. Indeed, we ourselves have stated the requirement without using that phrase.” (*People v. Horning* (2004) 34 Cal.4th 871, 908.) We reiterated in *Horning* that if the felony was merely incidental to the murder, no separate felony-based special circumstance exists, and the instruction’s explanation that the robbery must not be “ ‘merely incidental to the commission of the murder’ ” adequately conveys this requirement. (*Ibid.*) Because the court properly instructed the jury that it could not find the special circumstance true if it found the robbery to be merely incidental to the commission of the murder, there was no error.

### 4. *Proof Beyond a Reasonable Doubt*

Defendant contends the instructions on circumstantial evidence (CALJIC Nos. 2.01, 2.02, 8.83, 8.83.1) diluted the proof-beyond-a-reasonable-doubt standard because they “informed the jurors that if [he] *reasonably appeared* to be guilty, they could find him guilty even if they entertained a reasonable doubt as to guilt.” We have previously rejected similar challenges to

these instructions. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1058.) Defendant offers no persuasive reason for us to revisit our precedent.

### 5. *Flight Instruction*

Defendant raises three challenges to the trial court's instruction on flight, CALJIC No. 2.52.

He first asserts the instruction was unnecessary because it was duplicative of the general jury instructions regarding circumstantial evidence, citing CALJIC Nos. 2.00, 2.01, and 2.02. We have previously rejected this claim, concluding: " 'CALJIC Nos. 2.00, 2.01, and 2.02 instruct[] the jury on the definition of circumstantial evidence and its sufficiency in establishing facts to establish guilt. On the other hand, CALJIC No. 2.52 [is] a cautionary instruction that benefit[s] the defense by "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." [Citation.]' " (*People v. Leon* (2015) 61 Cal.4th 569, 608.)

Defendant next contends the instruction was impermissibly argumentative in light of *People v. Mincey* (1992) 2 Cal.4th 408, which he contends rejected, as argumentative, an instruction structurally similar to CALJIC No. 2.52. We have described the instruction in *Mincey*, like that in CALJIC No. 2.52, as having an if/then structure: " 'If [certain facts] are shown, then you may [draw particular conclusions].' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 330.) We explained in *Bonilla*, however, that the structure of the instruction given in *Mincey* was not problematic. Rather, the *Mincey* instruction was flawed because it contained argumentative language that focused on the defendant's version of the facts, not his legal theory of the

case. (*Bonilla*, at p. 330.) In *Bonilla*, we also rejected the defendant's argument that CALJIC No. 2.03, another consciousness of guilt instruction, was argumentative simply because it, too, contained the if/then structure. (*Bonilla*, at p. 330.) For the same reason, we reject defendant's argument here.

Lastly, defendant asserts that the instruction permitted the jury to draw an impermissible inference concerning his guilt. We have previously rejected this contention (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 438; *People v. Rundle* (2006) 43 Cal.4th 76, 153–154), and defendant presents no compelling reason to reconsider these decisions.

### 6. *Motive Instruction*

Defendant contends the trial court erred in instructing the jury with CALJIC No. 2.51, regarding motive, because it improperly allowed the jury to determine guilt based upon the presence of an alleged motive and thus shifted the burden of proof to the defense. We have repeatedly rejected substantially similar contentions, and we do so again here. (*People v. Nelson* (2016) 1 Cal.5th 513, 552–553; *People v. Capistrano* (2014) 59 Cal.4th 830, 876–877.)

### III. PENALTY PHASE ISSUES

### A. Refusal of Defendant's Requested Jury Instructions

#### 1. *Instructions on Aggravating Factors*

Defendant contends the trial court erred when it refused his proposed instruction that would have informed the jurors that they could not double-count the facts underlying the special circumstance. The proposed instruction read: "You must not consider as an aggravating factor the existence of any special circumstances if you have already considered the facts of the

special circumstance as a circumstance of the crime for which the defendant has been convicted. [¶] In other words, do not consider the same facts more than once in determining the presence of aggravating factors." The trial court rejected the proposed instruction, concluding that defendant's concern was addressed in CALJIC No. 8.88.

Defendant cites *People v. Monterroso* (2004) 34 Cal.4th 743, in which we held the trial court committed harmless error when it denied the defendant's request to instruct the jury against double-counting the special circumstances. (*Id.* at p. 789.) The court had instructed the jury with CALJIC No. 8.85, "which instructed the jury to consider, take into account, and be guided by, inter alia, 'the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.'" (*People v. Monterroso*, at p. 789.) We noted that, even without the clarifying instruction the defendant had requested, the possibility that a jury would believe it could weigh each special circumstance twice was remote, and thus, in the absence of any misleading argument by the prosecutor or some other event substantiating the claimed double-counting, reversal was not required. (*Id.* at pp. 789–790.)

In the present case, the trial court also instructed the jury in the language of CALJIC No. 8.85. Defendant does not allege that the prosecutor argued the issue in a misleading manner, nor does he point to anything in the record giving rise to a substantial likelihood of double-counting. Even assuming error, it was harmless beyond a reasonable doubt.

Defendant next contends that the trial court erred when it refused his proposed instruction that read: "In deciding whether

you should sentence the defendant to life imprisonment without the possibility of parole, or to death, you cannot consider as an aggravating factor any fact that was used by you in finding him guilty of murder in the first degree unless that fact establishes something in addition to an element of the crime of murder in the first degree." Section 190.3, factor (a), however, expressly permits the penalty phase jury to consider the circumstances of the crime in determining penalty, and on that ground, we have previously upheld the rejection of substantially similar proposed instructions. (See *People v. Moon* (2005) 37 Cal.4th 1, 40.)

### 2. *Refusal of Additional Penalty Phase Instructions*

Defendant contends that the trial court erroneously refused to give several requested penalty phase instructions that would have clarified the standard penalty phase instructions and provided guidance to the jurors. We disagree.

The first proposed instruction would have told the jury that certain sentencing factors could only be considered as mitigating. The trial court concluded the instruction was duplicative of CALJIC No. 8.85. It did not err. As we have previously held, the trial court need not define which statutory factors could be considered aggravating and mitigating. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509.)

The second proposed instruction would have told the jury that its consideration of mitigating factors was not limited to the factors provided and that jurors could consider any other circumstances relating to the case or to defendant as reasons for not imposing the death penalty. We have previously held that such instructions are not necessary because "the catchall section 190.3, factor (k) instruction 'allows the jury to consider a

virtually unlimited range of mitigating circumstances.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1007.)

The third proposed instruction would have told the jury it could not consider evidence of defendant's lifestyle or background as an aggravating factor, but it could consider such evidence as a mitigating factor. In *People v. Ochoa* (2001) 26 Cal.4th 398, 457, we concluded that the court's refusal to give a substantially similar instruction was not erroneous because, as in this case, the court properly instructed the jury on aggravating and mitigating factors.

Defendant also proposed instructing the jury that it could consider as a mitigating circumstance whether defendant was under the influence of any mental or emotional disturbance at the time of the offense and whether his capacity to appreciate the criminality of his conduct was a result of mental disease, mental defect, or intoxication. The court rejected these instructions, concluding they were cumulative. Defendant now asserts the proposed instructions were not cumulative because, unlike CALJIC No. 8.85, they did not contain the term "extreme." (See, e.g., CALJIC No. 8.85 [permitting the jury to consider "[w]hether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance" (italics added)].) He asserts this distinction is important because jurors "must be allowed to consider a defendant's entire personal history and characteristics, not just those that may be seen as 'extreme.' " We have previously held, however, that the "use of restrictive adjectives — i.e., 'extreme' and 'substantial' — in the list of mitigating factors in section 190.3 does not act unconstitutionally as a barrier to the consideration of mitigation." (*People v. Harris* (2005) 37 Cal.4th 310, 365.) We

have also held that the instruction allows a jury to consider a defendant's mental condition as mitigation even if not " 'extreme.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 720–721.)

In addition, defendant requested that the court instruct the jury that defendant bore no burden to prove the existence of mitigating factors, that a mitigating factor need not be proven beyond a reasonable doubt, and that the jury need not unanimously agree on any fact or circumstance offered in mitigation. We again conclude that the trial court did not err in refusing these instructions. (*Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633, 642] ["our case law does not require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt' "]; *Riggs, supra*, 44 Cal.4th at p. 328 [the court was not required to instruct the jury on burden of proof]; *People v. Breaux* (1991) 1 Cal.4th 281, 314–315 (*Breaux*) [the court is not required to instruct the jury that unanimity on mitigating factors was not required].)

Defendant also proposed three instructions regarding the jurors' consideration of aggravating factors. The first proposed instruction would have told the jury it could consider rebuttal evidence offered by the prosecution only as it relates to the existence or weight of a mitigating factor; it could not consider it as an aggravating factor. Because the prosecutor did not present rebuttal evidence during the penalty phase, the court did not err in refusing to give this proposed instruction. Defendant asserts that the prosecutor nonetheless presented rebuttal evidence during its case in chief (namely, evidence of his background and character) and that such evidence should have instead been presented as rebuttal evidence. Therefore, defendant argues, the court should have provided the proposed

instruction. Because defendant does not actually challenge the admissibility of this evidence during the prosecutor's case in chief, we decline to decide whether or not it was improper. As the Attorney General notes, even if the evidence was improperly introduced during the case in chief and should have been introduced as rebuttal evidence, defendant's proposed instruction would have confused the jury, as the jury would not have understood what evidence the instruction referred to.

The second proposed instruction would have told the jury that it must find an aggravating factor has been proven beyond a reasonable doubt. We have repeatedly held that, except for evidence of other crimes and prior convictions under section 190.3, factors (b) and (c), the jury need not find the aggravating factors have been proven beyond a reasonable doubt. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235; *Williams*, *supra*, 49 Cal.4th at pp. 458-459.) We have no cause to reconsider those holdings here.

The third proposed instruction would have instructed the jurors that they could not allow sympathy for the victim or the victim's family to divert their attention from their sentencing role, and they could not impose a penalty of death as a purely emotional response to the evidence. The court did not err when it found this proposed instruction cumulative. The court instructed the jury with CALJIC No. 8.84.1, which in relevant part provides, "You must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings." We presume the jurors understood and followed the court's instruction. (*People v. Homick* (2012) 55 Cal.4th 816, 873.)

Lastly, defendant requested instructions regarding the jurors' weighing of factors and their consideration of mercy and sympathy. The first proposed instruction would have told the jury that it could decide to impose life without the possibility of parole even if it found no mitigating factors present. We have previously held that the trial court is not required to so instruct the jury. (*People v. Perry* (2006) 38 Cal.4th 302, 320; *People v. Johnson* (1993) 6 Cal.4th 1, 52.)

The second proposed instruction would have told the jury that the presence of a single mitigating factor is sufficient to support a vote against imposing the death penalty. We have previously held a trial court does not err in refusing such an instruction. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1160–1161.)

The third proposed instruction provided: "The law of California does not require that you ever vote to impose the penalty of death. After considering all of the evidence in the case and instructions given to you by the court, it is entirely up to you to determine whether you are convinced that the death penalty is the appropriate punishment under all of the circumstances of the case." We have previously held that such instruction is misleading and argumentative if it does not also inform the jury that the law has no preference for the punishment of life without the possibility of parole. (*People v. Earp* (1999) 20 Cal.4th 826, 903.) Rather, a correct statement of California law is that "our law 'expresses no preference as to the appropriate punishment.' " (*Ibid.*) The trial court properly rejected defendant's proposed instruction.

Defendant also requested that the jury be instructed that, on the basis of mercy, it could decide not to impose the death

penalty, regardless of whether or not defendant deserved their sympathy, and that if any of the evidence aroused sympathy to such an extent that they believed death was not an appropriate punishment, the jury could act on that sympathy by imposing life in prison without the possibility of parole.  In rejecting these proposed instructions, the trial court concluded they were duplicative of CALJIC No. 8.85, factor (k), which informed the jury that it could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."  (*Ibid*., internal brackets omitted.)  "As we have previously explained, CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy. [Citation.]  We therefore 'must assume the jury already understood it could consider mercy and compassion.' "  (*People v. Ervine* (2009) 47 Cal.4th 745, 801.)

## B.  Instruction on Applicable Sentencing Factors

Defendant contends the trial court prejudicially erred in delivering its oral instructions to the jury.

While reading the penalty phase instructions to the jury, the court read CALJIC No. 8.85 as follows:  "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case except as you may hereafter be instructed. You *may* consider, take into account and be guided by the following factors, if applicable . . . ."  (Italics added.)  The court erroneously said "may consider" instead of "shall consider," but the written version of CALJIC No. 8.85 correctly instructed the jury that it *shall* consider the enumerated factors.

The court also instructed the jury with CALJIC No. 8.88, which read in part: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you *shall* consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed." (Italics added.) The court also instructed the jurors, "You are to be governed only by the instruction in its final wording."

We presume the jury understands and follows the trial court's instructions, including the written instructions. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Moreover, "[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*Ibid*.) Defendant cites to nothing in the record to rebut the presumption that the jurors followed the written instructions that were provided.

## IV. OTHER ISSUES

### A. Challenges to the Death Penalty

Defendant presents a number of challenges to California's death penalty law that our prior decisions have considered and rejected. He provides no persuasive reason for us to reexamine the following conclusions:

"California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment." (*People v. Williams* (2013) 58 Cal.4th 197, 294.)

"Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not lead to the imposition of the death penalty in an arbitrary or capricious manner." (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

"Nor is the death penalty statute unconstitutional for not requiring 'findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.'" (*People v. Erskine* (2019) 7 Cal.5th 279, 304.)

CALJIC No. 8.88 is not impermissibly broad. (*Breaux, supra,* 1 Cal.4th at p. 316, fn. 14.)

The death verdict need not be based on unanimous jury findings. "While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess such potentially aggravating factors as the circumstances of the capital crime (§ 190.3, factor (a)), prior felony convictions (*id.*, factor (c)), and other violent criminal activity (*id.*, factor (b)), and decide for him- or herself 'what weight that activity should be given in deciding the penalty.'" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 41 (*Demetrulias*).)

The trial court need not instruct the jury that it must return a sentence of life without the possibility of parole if it finds that mitigation outweighs aggravation. (*People v. Duncan* (1991) 53 Cal.3d 955, 978.)

Instructions on the meaning of a sentence of life imprisonment without the possibility of parole and on the

"'presumption of life'" are not constitutionally required. (*Demetrulias, supra,* 39 Cal.4th at p. 43.)

"The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors, nor must it identify which factors are aggravating and which are mitigating." (*People v. Cook* (2006) 39 Cal.4th 566, 618.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*People v. Snow* (2003) 30 Cal.4th 43, 126.)

"The capital sentencing scheme does not violate equal protection by denying to capital defendants procedural safeguards that are available to noncapital defendants." (*People v. Thomas* (2012) 53 Cal.4th 771, 836 (*Thomas*).)

California's death penalty does not violate international law or international norms of decency. (*Thomas, supra,* 53 Cal.4th at p. 837.)

## B. Restitution Fine

The abstract of judgment indicates that the trial court imposed a $10,000 restitution fine. However, the court did not actually impose the fine at the sentencing hearing; it was merely added to the abstract of judgment later. Defendant contends that because the court never imposed the fine in open court in his presence, it should be stricken from the abstract of judgment. (See § 1202.4; *People v. Tillman* (2000) 22 Cal.4th 300, 303.) The Attorney General properly concedes the error. We order the restitution fine stricken from the record and the minutes, and the abstract of judgment modified accordingly.

## C. Cumulative Error

Defendant contends that the cumulative effect of the asserted errors requires reversal of the judgment. We have identified one error, the imposition of the restitution fine, and assumed other errors but found no prejudice. Nor is this error and any assumed error cumulatively prejudicial.

## V. CONCLUSION

The restitution fine is ordered stricken from the abstract of judgment. The judgment is affirmed in all other respects.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

PEOPLE v. FREDERICKSON

S067392


Concurring Opinion by Justice Liu


I agree with the judgment and with today's opinion, except that I would reach the merits of whether Penal Code section 1018 is constitutional after *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500] (*McCoy*) and hold that it is.

Penal Code section 1018 says that no guilty plea to an offense punishable by death or life without the possibility of parole "shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel."  (All statutory references are to the Penal Code.)  Frederickson's primary argument in his automatic appeal is that the trial court denied his repeated requests to plead guilty based on section 1018 and that section 1018 violates his right to control his defense under the Sixth Amendment to the United States Constitution.  The court dismisses this argument exclusively on the basis that he failed to secure a ruling from the superior court rejecting his plea on section 1018 grounds.  (Maj. opn., *ante*, at pp. 50–51.)  But the record is too muddled to support that conclusion, and in any event, this court has often excused forfeitures raising pure questions of law.  On the merits, I would reject Frederickson's claim that section 1018 is unconstitutional after *McCoy*.  *McCoy* does not upend our long and unbroken precedent holding that section 1018 constitutes a valid balance between society's interest in ensuring the

reliability of judgments in capital cases and a criminal defendant's right to conduct his own defense.

## I.

I am skeptical of dismissing Frederickson's section 1018 challenge on the ground that he failed to secure a ruling from the superior court that section 1018 barred him from pleading guilty as a self-represented capital defendant. The record is at least ambiguous as to whether the municipal court on January 27, 1997 implied such a ruling and therefore indicated to Frederickson that any attempt to plead guilty at his preliminary hearing would be futile because of section 1018.

As today's opinion recounts (maj. opn., *ante*, at pp. 17–27), Frederickson diligently pursued his desire to plead guilty before trial until the prosecution informed him that he could not lawfully do so, and the municipal court appeared to endorse that view. Frederickson expressed a desire to waive his preliminary hearing and plead guilty on December 24, 1996 at an in camera hearing in the superior court to address the disbursement of investigative funds. At this point, he was representing himself with the aid of advisory counsel. Because only the disbursement issue was before it, the superior court explained that "the issue as to whether or not you're going to plead guilty or waive a preliminary hearing is really not before me today." Frederickson repeated his wishes by saying, "I'm pleading guilty and that's that." The court responded, "Well, you haven't done that yet." Frederickson said, "Well, I'm attempting to very, very, very hard." The superior court said it would contact the municipal court, where the rest of Frederickson's case was pending, and ask it to calendar his preliminary hearing as soon as possible.

On January 27, 1997, the superior court held another in camera hearing, this time to address Frederickson's violation of his self-representation jail privileges. Frederickson's advisory counsel reiterated Frederickson's desire to waive the preliminary hearing and plead guilty, and the superior court again offered to contact the municipal court.

That afternoon, Frederickson and his advisory counsel appeared in municipal court. Frederickson stated to the court, "[T]he guilt of my crime has been weighing heavily on me with a remorseful heart. I would like to offer a change of plea and enter a plea of guilty to murder in the first degree and admit the special circumstances and waive all appellate rights at this time." Before the municipal court could rule on his request, the prosecutor asked to speak with Frederickson and his advisory counsel off the record. Following that conversation, the prosecutor summarized the conversation for the court: "What I did your honor, for the record I had a brief conversation with Mr. Frederickson in the presence of Mr. Freeman [advisory counsel] and I had suggested to Mr. Frederickson that he seriously reconsider his thoughts about what he was planning on doing. He wants to plead guilty to the charges. *I told him by law he cannot plead guilty to a special circumstances allegation case. He understands that, but I told him no judge can accept your plea.* Furthermore, I told him that it was my opinion Mr. Freeman would offer him the best possible representation and suggested that he follow Mr. Freeman's advice on the matter. It's my understanding Mr. Frederickson despite Mr. Freeman's conversations with him and my own conversations with him in Mr. Freeman's presence Mr. Frederickson still wants to plead guilty, although I think he realizes that he cannot. I think it's his desire to actually waive the preliminary

hearing which is still scheduled for February 5th. My last suggestion to him was not to do anything today. That we just come on February 5th and have more of a chance to think about it, to talk to Mr. Freeman, or talk to his investigator and then he can decide what he wants to do on the 5th." (Italics added.)

The court responded: "Well, that is all true, but Mr. Tanizaki [the prosecutor], the People also have a right to a preliminary examination. So even if Mr. Frederickson does want to waive preliminary hearing, the People may choose not to." The court went on to explain to Frederickson that the prosecution was not prepared to waive the preliminary hearing at that time and suggested that Frederickson reassert his request if he wished to do so on February 5 at his preliminary hearing. At the preliminary hearing, Frederickson did not request to waive the hearing or to plead guilty.

The prosecutor's summary of his January 27, 1997 conversation with Frederickson and advisory counsel suggests that he told Frederickson that section 1018 prevented him from pleading guilty to a capital crime. The prosecutor specifically stated that Frederickson "by law . . . cannot plead guilty to a special circumstances allegation case," an evident reference to section 1018. The prosecutor reinforced this by saying that "no judge can accept your plea." He did not say that Frederickson could not plead guilty *at this hearing* or that he could not plead guilty *before a municipal court*; instead, he suggested that the legal bar to pleading guilty was unconditional for Frederickson, who proceeded pro per. This categorical statement did not suggest that "the prosecutor may only have meant that no judge could [accept his plea] at that time." (Maj. opn., *ante*, at p. 49, fn. 11). Indeed, at a hearing on October 21, 1997, the prosecutor asked the court to bar Frederickson from mentioning that he

had previously attempted to plead guilty because "the Penal Code specifically disallows a guilty plea while he's in pro per."

The municipal court then endorsed the entirety of the prosecutor's remarks to Frederickson, stating, "Well, that is all true." The court did not expressly deny Frederickson's attempt to plead guilty based on section 1018, and according to today's opinion, it appears that the municipal court had no jurisdiction to accept such a plea. (Maj. opn., *ante*, at pp. 42–44.) But the municipal court's endorsement of the prosecutor's admonition that "no judge can accept [Frederickson's] plea" informed Frederickson that section 1018 barred him from pleading guilty regardless of which court he was in.

Today's opinion relies heavily on the fact that the municipal court on January 27, 1997 did not have jurisdiction to accept Frederickson's guilty plea and that Frederickson should have pressed for a ruling on his request to plead guilty at his February 5, 1997 preliminary hearing. (Maj. opn., *ante*, at pp. 47–50.) But Frederickson had no reason to press for a ruling on his guilty plea request at the preliminary hearing; in light of the municipal court's endorsement of the prosecutor's statement that "no judge can accept [his] plea," Frederickson had good reason to believe any further effort to plead guilty would have been futile. Indeed, based on the prosecutor's remarks at the hearing on October 27, 1997, it appears that both parties operated on the assumption that a court had in fact rejected Frederickson's plea on the ground that it was precluded by section 1018. Given Frederickson's diligent efforts to plead guilty until the municipal court endorsed the prosecutor's statement that "by law he cannot plead guilty to a special circumstances allegation case," I would not reject Frederickson's section 1018 challenge on forfeiture grounds.

In any event, we regularly excuse forfeiture where the defendant has asserted the deprivation of a fundamental constitutional right (*People v. Vera* (1997) 15 Cal.4th 269, 276 ["A defendant is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights."]), and we have recognized, approvingly, that the Courts of Appeal have excused forfeiture "when a forfeited claim involves an important issue of constitutional law or a substantial right" or "when applicability of the forfeiture rule is uncertain or the defendant did not have a meaningful opportunity to object at trial" (*In re Sheena K.* (2007) 40 Cal.4th 875, 887–888, fn. 7 [collecting cases]). Frederickson's claim implicates his Sixth Amendment rights, and ample precedent supports excusal of any forfeiture here.

## II.

On the merits, I would hold that section 1018 is constitutional notwithstanding the high court's decision in *McCoy*. I addressed this issue in *People v. Miracle* (2018) 6 Cal.5th 318, 360–361 (dis. opn. of Liu, J.), and reprise the main points here. I note that the Attorney General in this case, contrary to his position in *Miracle*, contends that section 1018 is constitutional and assured this court at oral argument that going forward he will no longer take the position that section 1018 is unconstitutional.

At the core of the question is whether the Eighth Amendment requirement of "reliability in the determination that death is the appropriate punishment" (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 (*Woodson*)), when balanced against a capital defendant's Sixth Amendment right to control his own defense, allows the Legislature to limit that defendant's

ability to plead guilty without consent of counsel. A long and unbroken line of precedent has upheld section 1018 as striking an appropriate balance between these interests, and *McCoy* does not disturb that precedent.

### A.

The Sixth Amendment "grants to the accused personally the right to make his defense." (*Faretta v. California* (1975) 422 U.S. 806, 819 (*Faretta*).) This right, grounded in the "fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty" (*Weaver v. Massachusetts* (2017) 582 U.S. __, __ [137 S.Ct. 1899, 1908]), guarantees to the accused the "ultimate authority to make certain fundamental decisions regarding the case" (*Jones v. Barnes* (1983) 463 U.S. 745, 751 (*Barnes*)).

However, "the right to self-representation is not absolute," particularly in capital cases where there are competing constitutional concerns. (*Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 161 (*Martinez*).) The Eighth Amendment's prohibition on cruel and unusual punishment imposes a "high requirement of reliability [in] the determination that death is the appropriate penalty in a particular case." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1228 (*Bloom*).) The high court has long recognized that the Eighth Amendment requires "a greater degree of reliability when the death sentence is imposed" because of the "qualitative difference between death and other penalties." (*Lockett v. Ohio* (1978) 438 U.S. 586, 604 (plur. opn.); see also *Beck v. Alabama* (1980) 447 U.S. 625, 637 (*Beck*); cf. *People v. Horton* (1995) 11 Cal. 4th 1068, 1134.) This heightened requirement reflects "the fundamental respect for humanity underlying the Eighth Amendment"

(*Woodson*, *supra*, 428 U.S. at p. 304) and the " 'vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion' " (*Beck*, at pp. 637–638). As a result, certain procedural safeguards may be warranted in a capital case because they mitigate "risk [that] cannot be tolerated in a case in which the defendant's life is at stake." (*Id.* at p. 637; see *id.* at pp. 637–638 & fn. 14 [requiring lesser included offense instruction in a capital case but "not decid[ing] whether the Due Process Clause would require the giving of such instructions in a noncapital case"].)

This court has recognized that the "rights and decisions that are normally personal to a criminal defendant may be limited or overruled in the service of death penalty reliability." (*People v. Mai* (2013) 57 Cal.4th 986, 1055 (*Mai*); see *Martinez*, *supra*, 528 U.S. at p. 162 ["[T]he government's interest in ensuring the integrity . . . of the trial at times outweighs the defendant's interest in acting as his own lawyer."].) In particular, we have long recognized that section 1018, which reflects the legislative judgment that heightened requirements for guilty pleas to capital crimes are necessary to mitigate the risk of unreliability in California's death penalty scheme, strikes a constitutionally valid balance between competing Sixth Amendment and Eighth Amendment considerations.

In *People v. Chadd* (1981) 28 Cal.3d 739 (*Chadd*), we upheld section 1018 against a constitutional challenge that the statute "denies [the defendant] his 'fundamental right' to control the ultimate course of the prosecution." (*Chadd*, at p. 747.) We explained that the Legislature amended section 1018 to require capital defendants to appear with counsel and obtain counsel's consent before pleading guilty "to serve as a further independent

safeguard against erroneous imposition of a death sentence." (*Chadd*, at p. 750.) We noted that the amendments to section 1018 were part of a comprehensive revision of California's death penalty statutes in response to the Eighth Amendment concerns raised in *Furman v. Georgia* (1972) 408 U.S. 238, which held that the operation of the death penalty was arbitrary at the time. (*Chadd*, at p. 750 [chronicling legislative history of section 1018].)

Moreover, we rejected the Attorney General's argument that section 1018 as we construed it "is unconstitutional because it allows counsel to 'veto' a capital defendant's decision to plead guilty." (*Chadd*, *supra*, 28 Cal.3d at p. 747.) We specifically recognized that section 1018 was a constitutionally permissible balance between the constitutional concerns of reliability and defendant autonomy: "[The Attorney General] fails to recognize the larger public interest at stake in pleas of guilty to capital offenses. It is true that in our system of justice the decision as to how to plead to a criminal charge is personal to the defendant: because the life, liberty or property at stake is his, so also is the choice of plea. [Citation.] But it is no less true that the Legislature has the power to regulate, in the public interest, the manner in which that choice is exercised." (*Chadd*, at pp. 747–748.) We continued, "The Attorney General in effect stands *Faretta* on its head: from the defendant's conceded right to 'make a defense' in 'an adversary criminal trial,' the Attorney General attempts to infer a defendant's right to make *no* such defense and to have *no* such trial, even when his life is at stake. But in capital cases, as noted above, the state has a strong interest in reducing the risk of mistaken judgments. Nothing in *Faretta*, either expressly or impliedly, deprives the state of the right to conclude that the danger of erroneously imposing a

death sentence outweighs the minor infringement of the right of self-representation resulting when defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent." (*Id.* at p. 751.)

This holding — that section 1018 strikes a permissible balance between Eighth Amendment reliability concerns and the defendant's Sixth Amendment interest in control over an aspect of the defense — has been a consistent through-line in our capital jurisprudence. In 2007, we reaffirmed this understanding of section 1018 in *People v. Alfaro* (2007) 41 Cal.4th 1277 (*Alfaro*). Relying extensively on *Chadd*, we concluded that defense counsel's refusal to consent to a guilty plea was reasonable where a capital defendant sought to plead guilty in order "to prevent the presentation of evidence regarding an accomplice." (*Alfaro*, at p. 1301.) We rejected the defendant's argument that her desire to plead guilty "concerned a fundamental aspect of her defense that . . . must remain within defendant's control." (*Id.* at p. 1302.) Our unanimous opinion reaffirmed that "[t]he consent requirement of section 1018 has its roots in the state's strong interest in reducing the risk of mistaken judgments in capital cases and thereby maintaining the accuracy and fairness of its criminal proceedings. [Citation.] The statute constitutes legislative recognition of the severe consequences of a guilty plea in a capital case, and provides protection against an ill-advised guilty plea and the erroneous imposition of a death sentence." (*Id.* at p. 1300.)

We have never suggested that autonomy interests implicated by a capital defendant's desire to plead guilty take precedence over heightened reliability interests. Rather, the baseline requirement that the prosecution "discharge[] its burden of proof at the guilt and penalty phases" has been the

fundamental point of departure for our evaluation of capital defendants' autonomy rights. (*Bloom*, *supra*, 48 Cal.3d at p. 1228.) In such cases, we have reiterated that "a defendant may not discharge his lawyer [in a capital case] in order to enter . . . a [guilty] plea over counsel's objection." (*Mai*, *supra*, 57 Cal.4th at p. 1055; see *People v. Daniels* (2017) 3 Cal.5th 961, 983, fn. 1 (*Daniels*).)

Reliability concerns are particularly significant at the plea phase, since the plea substitutes for the prosecution's discharge of the burden of proof, a bedrock component of the adversarial process ensuring that outcomes are reliable. (See *Boykin v. Alabama* (1969) 395 U.S. 238, 242 [describing the plea as "itself a conviction"].) Thus "a trial, even one where a defense is voluntarily forgone, is fundamentally different from a guilty plea" because in a trial, "the state [i]s put to its burden of proof." (*Daniels*, *supra*, 3 Cal.5th at p. 983.) At the same time, the defendant does not have the "absolute right under the Constitution to have [a] guilty plea accepted by [a] court." (*North Carolina v. Alford* (1970) 400 U.S. 25, 38, fn. 11; see *Lafler v. Cooper* (2012) 566 U.S. 156, 168 ["It is, of course, true that defendants have 'no right to be offered a plea . . . nor a federal right that the judge accept it.' "].)

Finally, we have found similar legislative judgments limiting a defendant's prerogative to direct his representation to be permissible because they further society's interests in the reliability of criminal judgments. For example, a capital defendant cannot waive automatic appeal of a judgment of death (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b)) because "the state . . . has an indisputable interest in it which [a capital defendant] cannot extinguish." (*People v. Stanworth* (1969) 71 Cal.2d 820, 834.) We have likewise recognized the requirement

that defendants be represented by counsel in competency proceedings as a constitutionally valid legislative choice insofar as it limits defendants' right of self-representation in service of reliability. (*People v. Lightsey* (2012) 54 Cal.4th 668, 696–697 [noting special concern with the possibility for "breakdown . . . in the process of meaningful adversarial testing central to our system of justice"].) Section 1018 represents a similarly valid legislative judgment in light of competing constitutional considerations.

## B.

The high court's recent decision in *McCoy* does not upend our longstanding precedent. In *McCoy*, the high court reversed the conviction of a capital defendant whose counsel had conceded his client's guilt at trial over defendant's objections. (*McCoy*, *supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1512].) Before trial, McCoy's attorney had determined that the best strategy for avoiding a death sentence was to admit to the three murder charges during the guilt phase and plead for mercy during the penalty phase. (*Id.* at p. 1506.) McCoy disagreed and was " 'furious' " with his attorney's strategy. (*Ibid.*) He insisted that his attorney pursue acquittal instead. The trial court denied McCoy's request to remove his counsel and defense counsel's request to be relieved if McCoy secured other counsel. It instructed counsel to decide how to proceed. At trial, McCoy's counsel acknowledged during his opening statement that the evidence unambiguously showed McCoy committed the murders, while McCoy testified he was innocent. (*Id.* at p. 1507.) The jury ultimately found the defendant guilty and returned three death verdicts. (*Ibid.*)

The high court reasoned that by availing himself of the Sixth Amendment right to assistance of counsel, McCoy did not "surrender control entirely to counsel." (*McCoy, supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1508].) While "[t]rial management is the lawyer's province," the court explained, "[s]ome decisions . . . are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Ibid*; see also *id.* at p. 1505 ["[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense:  to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt."].)  The high court concluded that because McCoy's decision to assert innocence was a choice about the objectives of his case, his counsel could not override that decision over his objections. (*Id.* at pp. 1508–1509.)

Although *McCoy* explained that the choice of "whether to plead guilty" (*McCoy, supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1508]) or "to admit guilt in the hope of gaining mercy at the sentencing stage" is "the defendant's prerogative" (*id.* at p. 1505), the high court was not announcing any new legal principle in doing so.  Rather, it was restating established Sixth Amendment principles, as evidenced by its citation to *Jones v. Barnes, supra*, 463 U.S. 745, which in turn relied on earlier authority to explain that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal, see *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1 (1977) (Burger, C.J., concurring); ABA Standards for Criminal Justice 4-5.2, 21-2.2 (2d ed. 1980)." (*Barnes,* at p. 751; see *McCoy,* at p. __ [138 S.Ct. at p. 1508].)

This dicta adds nothing to the legal landscape that already existed when we decided *Chadd* and *Alfaro*.

More importantly, the Eighth Amendment concerns reflected in section 1018 were not at issue in *McCoy*. Rather than insist upon pleading guilty, the defendant in *McCoy* sought to maintain his innocence and subject his case to the rigors of the adversarial process. He did not seek to avoid that process and its accompanying safeguards. As a result, the high court had no occasion to address, and did not address, the heightened Eighth Amendment reliability interests where a capital defendant seeks to forgo trial on the issue of his guilt. *McCoy* did not weigh a defendant's autonomy interests against countervailing reliability interests because there was no conflict between the defendant's objectives and the reliability interests of the Eighth Amendment; it did not address whether a capital defendant may enter a guilty plea against the advice of counsel in the face of a state statute requiring counsel's consent as a measure to lessen the risk of a mistaken judgment. (See *People v. Ghobrial* (2018) 5 Cal.5th 250, 285 [" '[A] decision is not authority for propositions not considered.' "].) By contrast, we expressly addressed the interplay between the heightened need for reliability in capital cases and a defendant's right to control his own defense in *Chadd*, and our reasoning and holding remain controlling.

It is no light matter to find a statute unconstitutional, particularly one that we have upheld on numerous occasions. That is especially true here, given the ramifications of a guilty plea in a capital case. (*Chadd, supra*, 28 Cal.3d at p. 748.) Against the backdrop of all that we have said about the constitutionality and importance of section 1018's requirement of counsel's consent, *McCoy*'s broad dicta is not a sufficient basis

for jettisoning decades of precedent. This is not to suggest that any restriction on a capital defendant's right to his own defense in the name of reliability is constitutionally valid. That right is foundational and rooted in " 'respect for the individual which is the lifeblood of the law.' " (*Faretta, supra*, 422 U.S. at p. 834.) The balance to be struck is a delicate one, and with respect to section 1018, it is a balance we struck decades ago.

I would hold that the trial court did not err in refusing to allow Frederickson to plead guilty without counsel's consent. In all other respects, I join the opinion of the court.


**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Frederickson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S067392
**Date Filed:**  February 3, 2020

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  William R. Froeberg

_____

**Counsel:**

Michael J. Hersek, State Public Defender,  and Douglas Ward, Deputy State Public Defender,

Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Lance E. Winters and Dane R. Gillette, Chief Assistant Attorneys General, Julie L. Garland, Ronald Matthias and Gary W. Schons, Assistant Attorneys General, Holly D. Wilkens, Theodore M. Cropley, Annie Featherman Fraser, Ronald A. Jakob and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Douglas Ward
Attorney at Law
350 Bay Street, P.M.B. #199
San Francisco, California 94133
(415) 494-9252

Tami Falkenstein Hennick
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9223